MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2016 ME 172
Docket:        Cum-15-493
Argued:        June 8, 2016
Decided:       November 29, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, <u>GORMAN</u>, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

TIMOTHY M. HUNT

GORMAN, J.

[¶1]  Timothy M. Hunt appeals from a judgment of conviction entered in the trial court (Cumberland County, *Moskowitz, J.*) after a jury found him guilty of six counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2015), and six counts of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2015).  Hunt argues that the court (*Wheeler, J.*) erred by denying his motion to suppress evidence of inculpatory statements he made during a police interview.  Although he also raises a number of issues from the trial, we need consider only the admissibility of the evidence of his confession.  Because we conclude that the confession should have been suppressed, we vacate the judgment of conviction and remand the case for a new trial.

## I. BACKGROUND

[¶2]  On December 4, 2013, the Cumberland County Grand Jury issued an indictment charging Hunt with six counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C), and six counts of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1), involving an eight-year-old victim.  After pleading not guilty to the charges, Hunt moved to suppress evidence of incriminating statements he made during an interview with two Scarborough Police Department detectives.

[¶3]  At the hearing on his motion, Hunt argued that his incriminating statements during the interview were motivated by improper promises of leniency and were therefore involuntary.  The court (*Wheeler, J.*) heard testimony from a psychologist who had evaluated Hunt, from the detectives, and from Hunt.  The parties stipulated to the admission of four psychological assessment reports and a recording of the police interview that included both video and audio.

[¶4]  The recording shows that the following interactions took place. During the first part of the interview, Hunt repeatedly denied touching the victim inappropriately.  Throughout the interview, the detectives challenged Hunt's denials with, inter alia, minimization of the moral blame associated

with the alleged conduct, pleas to "do the right thing," and urges to avoid having the victim "go through" a trial.  Before he had confessed to any wrongdoing, but in response to questioning, Hunt expressed concern that admitting to "something like this could put [him] on that list," apparently referring to the Maine Sex Offender Registry.  In response, one of the detectives told him, "don't worry about that," "don't worry about going on the list," and "we're not gonna worry about anything else outside of this room, Tim, because it will work out, it will be fine."

[¶5]  Later, during a portion of the interview led by a second detective, the second detective told Hunt:

> [y]ou were worried about being on some kind of a list—*not everybody ends up on the list*.  I'll tell you the guys that end up on the list.  Those are the guys that I'm talking about on the other end of the scale.  The guys that hang out by schools, and they take pictures of little kids in places in public, and they put themselves in positions that they can be around kids for the sole purpose of perpetrating on a child.  Those are the guys that end up on lists.  *Guys like you . . . they don't end up [in] situations like that dramatic. They get help and they get opportunities like you're being given here today . . . .*

(Emphases added.)

[¶6]  The second detective also told Hunt that if Hunt was not being "one hundred percent truthful," he was "harming [him]self," and that

> You need to think about it, because you don't get this opportunity twice.  After today, it's over.  You're not gonna have another opportunity to come in here and explain yourself to [the first detective], and he's not gonna have another opportunity to help you.  Because if he thinks you're lying, after today, all hands are off. . . . If he knows . . . you're telling . . . the truth, we can work with this.  You could still go home today.  Okay?  Nobody's said you're going to get arrested.  Right?  Nobody's told you that today, right?  *This list thing you're worried about?  That's for the other end of the spectrum.  That's for the people that are problematic.*

(Emphases added.)   The first detective returned to the interview room. Resuming the interview, he said, "I know you mentioned earlier, you know, 'I'm worried about being on a list,' but I want you not to worry about that. You know, it—it—ah, *not everyone goes on a list.  Okay?  Not everyone does*." (Emphasis added.)

[¶7]  After Hunt made some incriminating statements, the first detective asked him why he hadn't confessed earlier in the interview.  Hunt explained that he "didn't know how to word it," that "maybe the right questions wasn't coming up for the right answer," and that his "mind's slow" and "isn't like all the other minds that catch on."  Hunt also said, "I don't want, you know, people to look at me in like, you know in a certain way. . . .  Like your um, your friend, well, your partner slash friend . . . *like he said, that I'm not even close to being on that list, you know?  That it should be fine*."  (Emphasis added.)  Only

after Hunt had incriminated himself did the first detective tell Hunt that he and his colleague were "not in control of that list."

[¶8]   In a written order denying Hunt's motion, the court found that Hunt had gone willingly to the Scarborough Police Department with the detectives to be interviewed, knowing that they wanted to talk to him about information they had received from the Department of Health and Human Services about "sexual allegations."   The court also found the following facts about the interview.   The detectives told Hunt that he was not under arrest, that he did not have to go with them, and that they would drive him back home at any time.   After bringing Hunt into an interview room, the first detective started an audio and video recording and told Hunt that the interview was being recorded.   He told Hunt that he was free to leave and advised him of his *Miranda* rights.   After stating each "right," the first detective asked whether Hunt understood, and Hunt responded affirmatively.

[¶9]   The court further found that after the second detective left the room, the first detective "reentered and used police interrogation techniques, including minimization of the crime."[1]   The court found that Hunt eventually "confessed to sexual contact" with the victim.

---

[1] The court did not specifically describe the "interrogation techniques" used by either detective.

[¶10]   Although noting that Hunt's "cognitive skills are less than average," the court stated "there was no indication of any impairment of Hunt's physical or mental condition."   The suppression court had two reports from psychologists who measured Hunt's cognitive capacity.   One measured Hunt's composite IQ as 81, with a nonverbal skills score of 92 and a verbal skills score of 75; another measured Hunt's composite IQ as 75, with a nonverbal skills score of 90 and a verbal skills score of 67.

[¶11]   Although Hunt testified at the suppression hearing that he had snorted Vicodin on the day of the interview, and was taking other medications prescribed for him, namely Wellbutrin (an antidepressant) and Risperdal (an antipsychotic), the court also found that "the video does not disclose any bizarre, psychotic or . . . drug-induced behavior"; "Hunt appeared to be alert and rational, and he could respond to questions with appropriate answers."

[¶12]   In a footnote apparently directed at Hunt's argument that his statements were involuntary in light of the detectives' references to "the list," the court stated that "[t]here is nothing illegal with . . . trying to narrow and shift the focus of the investigation on the critical issues, rather than possible outcomes in the case."   The court concluded, "The detectives['] interviewing

techniques were fundamentally fair and Hunt's confession was not a product of coercive police conduct."[2]

[¶13]   As a result of the court's ruling, the recording of Hunt's confession was admitted in evidence at trial, over his continuing objection.

[¶14]   The court (*Moskowitz, J.*) held a four-day jury trial in late July of 2015.  Just before trial, the State filed a motion in limine seeking to exclude Hunt's proposed expert testimony regarding police interrogation techniques and risk factors associated with false confessions.  After the parties conducted a voir dire of the expert, the court granted the State's motion, concluding that the testimony was inadmissible pursuant to M.R. Evid. 702 based on its findings that "it ha[d]n't been demonstrated in the voir dire that there is a reliable scientific basis for determining some causal relationship" between certain interrogation techniques and unreliable confessions, and "the subject matter of the proposed testimony is really not beyond the common knowledge of a lay juror."

[¶15]   The jury found Hunt guilty of all twelve charges.  The court entered a judgment on the verdict and sentenced Hunt to twenty-five years of

---

[2]  Although the court did not state expressly that the State had proved voluntariness beyond a reasonable doubt, in the absence of any indication to the contrary, we assume that the court applied the correct standard of proof.  *See State v. Ashe*, 425 A.2d 191, 194 n.4 (Me. 1981); *State v. Collins*, 297 A.2d 620, 627 (Me. 1972).

8

unsuspended imprisonment for each of the gross sexual assault charges and five years of unsuspended imprisonment for each of the unlawful sexual contact charges, all to be served concurrently, followed by a lifetime term of supervised release. Hunt appealed from the judgment of conviction.[3]

## II. DISCUSSION

[¶16] Hunt contends that the court (*Wheeler, J.*) erred by denying his motion to suppress because his incriminating statements were motivated by improper promises of leniency by police and were therefore involuntary. "The determination of whether a statement is voluntary is a mixed question of fact and law . . . ." *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595. We review "the court's factual findings . . . for clear error and its . . . ultimate determination regarding voluntariness" de novo. *Id.* (citations omitted). Here, as we noted, the interrogation was recorded, and the recording was admitted at the suppression hearing. Hunt does not challenge the accuracy of the recording or the suppression court's factual findings; he argues that the court misapplied legal principles. Thus, the facts are not in dispute. Accordingly, "we review the motion court's application of the law to those facts de novo," *State v. Dodge*, 2011 ME 47, ¶ 10, 17 A.3d 128.

---

[3] The Sentence Review Panel denied Hunt's application for leave to appeal his sentence. *State v. Hunt*, No. SRP-15-494 (Me. Sent. Rev. Panel Dec. 21, 2015); *see* 15 M.R.S. § 2151 (2015); M.R. App. P. 20.

A. Legal Standards

[¶17] In Maine, when a defendant in a criminal case moves to suppress statements on the ground that they were made involuntarily, the State has the burden to prove voluntariness beyond a reasonable doubt.[4] *State v. Kittredge*, 2014 ME 90, ¶ 24, 97 A.3d 106; *State v. Collins*, 297 A.2d 620, 627 (Me. 1972). To determine whether the suppression court erred when it concluded that Hunt's confession was "voluntary," we must first understand the concept of "voluntariness" as it has been employed in this area of law. Our jurisprudence on this issue has not always been entirely clear. With this opinion, we hope to clarify the law and process to be applied when determining the voluntariness of a confession in the face of a challenge to police action.

[¶18] The exclusionary rule for "involuntary" confessions is grounded in both the privilege against self-incrimination, guaranteed by the Fifth Amendment to the United States Constitution[5] and article I, section 6 of the

---

[4] In *Lego v. Twomey*, the United States Supreme Court held that in federal cases the government must prove voluntariness by a preponderance of the evidence. 404 U.S. 477, 482-89 (1972). "Of course," the Court noted, "the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." *Id.* at 489. In *Collins*, which we decided eleven months after *Lego*, we concluded that public policy and "the values we find at stake"—namely, safeguarding "the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances"—demand that, in Maine, the State must prove voluntariness beyond a reasonable doubt. 297 A.2d at 626-27 (alteration omitted) (quotation marks omitted).

[5] "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V.

10

Maine Constitution;[6] and the due process clause of the Fourteenth Amendment to the United States Constitution[7] and article I, section 6-A of the Maine Constitution.[8]

[¶19]  There is a distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice.  "Where the Fifth Amendment analysis seeks to determine whether the defendant's confession was compelled, a due process analysis asks 'whether the State has obtained the confession in a manner that comports with due process.'"  *State v. Rees*, 2000 ME 55, ¶ 36, 748 A.2d 976 (Saufley, J., dissenting) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)).  Here, because no one has claimed that a confession was "forced" out of Hunt, we examine whether admission of his confession violated his right to due process.  That is, we examine whether his statements were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would

---

[6]  "In all criminal prosecutions, the accused . . . shall not be compelled to furnish or give evidence against himself . . . ."  Me. Const. art. I, § 6.

[7]  "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend XIV.

[8]  "No person shall be deprived of life, liberty or property without due process of law . . . ."  Me. Const. art. I, § 6-A.

be fundamentally unfair. "The Due Process Clause . . . prohibits deprivations of life, liberty, or property without fundamental fairness through governmental conduct that offends the community's sense of justice, decency and fair play." *State v. McConkie*, 2000 ME 158, ¶ 9, 755 A.2d 1075 (quotation marks omitted).

[¶20] More than thirty years ago, we discussed due process and the requirement of voluntariness in *State v. Mikulewicz*, 462 A.2d 497, 500-01 (Me. 1983), a case in which the police had allowed a defendant to "consume substantial quantities of alcohol" during a custodial interrogation, *id.* at 498. We stated:

> [T]he voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system.

*Id.* at 500. We reiterate today that a confession is involuntary when it is made under circumstances that offend one of these fundamental values of social policy and constitutional law. *See Lego v. Twomey*, 404 U.S. 477, 485 (1972) ("The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles.").[9]

---

[9] The United States Supreme Court has "used the terms 'coerced confession' and 'involuntary confession' interchangeably by way of convenient shorthand." *Arizona v. Fulminante*, 499 U.S. 279,

[¶21] In *Mikulewicz*, after noting that "articulating a uniform test of voluntariness ha[d] proven a difficult task," we held that "[a] confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." 462 A.2d at 500-01. Nearly twenty years later, in a case involving a police officer who affirmatively misled a defendant by telling him that a confession would be kept in confidence, we quoted that rule from *Mikulewicz* and noted that "[t]he focus in a due process analysis . . . is not limited to the presence or absence of compulsion, but rather addresses the totality of the State's actions in obtaining the confession." *McConkie*, 2000 ME 158, ¶¶ 4, 9 & n.3, 10, 755 A.2d 1075 (quotation marks omitted).

---

287 n.3 (1991) (quotation marks omitted). In 1959, seven years before it decided *Miranda v. Arizona*, 384 U.S. 436 (1966), in "another in the long line of cases presenting the question whether a confession was properly admitted into evidence under the Fourteenth Amendment," *Spano v. New York*, 360 U.S. 315, 315 (1959), the United States Supreme Court explained why no conviction based on an involuntary confession could be tolerated:

> The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.

*Id.* at 320-21.

[¶22]   We have long held that when applying this totality of the circumstances approach to make a voluntariness determination, the trial court may consider various relevant circumstances, including

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; *threats, promises or inducements made to the defendant*; and the defendant's age, physical and *mental health, emotional stability*, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903 (emphases added) (quotation marks omitted); *see Michaud v. State*, 161 Me. 517, 530-31, 215 A.2d 87 (1965).

1.    Improper "Promises or Inducements"

[¶23]   We have discussed the effect "promises or inducements" may have on the voluntariness of a confession in a variety of cases, recognizing that not all statements made by law enforcement officers are improper.  For example, we have noted that neither "generalized and vague" suggestions that telling the truth will be helpful to a defendant in the long run, *Kittredge*, 2014 ME 90, ¶ 28, 97 A.3d 106, nor "[m]ere admonitions or exhortations to tell the truth," *State v. Tardiff*, 374 A.2d 598, 601 (Me. 1977), will factor

significantly into the totality of the circumstances analysis. *See Kittredge*, 2014 ME 90, ¶¶ 27-28, 97 A.3d 106; *Tardiff*, 374 A.2d at 601.

[¶24] Thus, in a host of cases, we have held that certain representations by law enforcement officers did not constitute improper promises of leniency. *See, e.g.*, *State v. Gould*, 2012 ME 60, ¶¶ 11-13, 43 A.2d 952 (officer "suggest[ed] that the State would get [the defendant] help" if he confessed); *State v. Lavoie*, 2010 ME 76, ¶ 21, 1 A.3d 408 (officer suggested that the defendant would get alcohol counseling if he confessed); *State v. Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445 (officer told the defendant that "the more cooperative you are, the better things are for you" (alteration omitted)); *State v. Dion*, 2007 ME 87, ¶ 34, 928 A.2d 746 (officer stated "that it would 'look better' for [the defendant] to confess"); *State v. Theriault*, 425 A.2d 986, 990 (Me. 1981) (officer stated that "'it would be better to tell us [the truth],' that 'it would make [the defendant] feel better,' and that 'people would think more of him if he got it off his chest'" (first alteration in original)).

[¶25] We have found officers' statements to defendants to be problematic when those statements involve false promises of leniency or misrepresentations about legal rights, however. In *Tardiff*, the defendant went to the police station and discussed three burglaries but did not admit to

any involvement in the crimes. 374 A.2d at 600. An officer drove him home. *Id.* During the car ride, the officer told the defendant that the police "were willing to help him if, in any way, [they] could," and that the officer "felt sure that the Captain would agree . . . that [the State] would charge him with one break, if he were willing to clear up all the matters that he had pending." *Id.* The defendant agreed to go back to the police station and talk with the captain. *Id.* After officers informed him of his *Miranda* rights, the defendant confessed to all three burglaries and, despite the officer's promise, he was charged with all three. *Id.* at 599-600. We concluded that because the officer's statement to the defendant was a false promise of leniency, it constituted an improper inducement to confess. *Id.* at 601.

[¶26] In *McConkie*, the defendant agreed to meet with police to discuss allegations of sexual contact with a teenager. 2000 ME 158, ¶ 2, 755 A.2d 1075. After an officer told the defendant, inter alia, that "any information he provided during the interview would 'stay confidential,'" the defendant made several incriminating statements.[10] *Id.* ¶ 4 (alteration omitted). We concluded that the trial court erred by denying the defendant's motion to suppress the statements, stating that "it is evident that [the defendant's]

---

[10] It was undisputed that the interview did not constitute a custodial interrogation, and therefore that police were not required to give the defendant *Miranda* warnings. *State v. McConkie*, 2000 ME 158, ¶ 7, 755 A.2d 1075; *see Miranda*, 384 U.S. at 478-79.

statements to [the officer] were obtained through the use of an interrogation tactic that does not fall within the bounds of fair play and that the admission of those statements at trial therefore violated [the defendant's] right to due process of law." *Id.* ¶ 10. The officer, we held, "was . . . not at liberty to affirmatively mislead [the defendant] as to his constitutionally protected right against self-incrimination." *Id.*

[¶27] In *Dodge*, again focusing on the nature and timing of the police statements, 2011 ME 47, ¶¶ 13-20, 17 A.3d 128, we distinguished the statements the defendant made after an officer's assurance of confidentiality from those he made after the officer's "prompt correction of his assurance that the conversation would remain private," *id.* ¶ 13. We held that the statements made before the officer's correction were properly suppressed. *Id.* ¶ 16.

[¶28] Most recently, in *State v. Wiley*, we vacated a conviction after the trial court denied the defendant's motion to suppress. 2013 ME 30, ¶¶ 11, 31, 61 A.3d 750. We determined that an improper offer of leniency was made, *id.* ¶ 25, where the interviewing law enforcement officer implied that if the defendant confessed, he would face a shorter sentence involving county jail and probation instead of "a lot of time in a state prison," *id.* ¶ 21 (quotation marks omitted). Our split decision in *Wiley* demonstrates the difficulty in

drawing the line between permissible police interrogation tactics and tactics that involve false promises and improper inducements by law enforcement. Nonetheless, we ultimately ruled that "[a] confession is not voluntary where an interrogating officer, with no more than apparent authority, leads a suspect to believe that a confession will secure a favorable, concrete sentence, and that belief motivates the suspect to confess." *Id.* ¶ 31.

[29] The lesson to be learned from these cases is that *false promises of leniency that induce a confession* are improper and thus will weigh significantly into our consideration of the totality of the circumstances in determining whether a confession must be suppressed.[11] A promise is false when it involves a benefit that could not be delivered—or is not in fact delivered—by the governmental agent making the promise, or when the agent has no authority to give the defendant what was offered. *See, e.g.*, *Kittredge*, 2014 ME 90, ¶ 27, 97 A.3d 106; *Wiley*, 2013 ME 30, ¶ 31, 61 A.3d 750; *State v. Coombs*, 1998 ME 1, ¶ 11, 704 A.2d 387; *Tardiff*, 374 A.2d at 601. A promise involves leniency when it suggests that the process of prosecution or sentencing will somehow be "better" for the defendant if the defendant

---

[11] The same is true for officers' misleading statements about the defendant's legal rights. *See State v. Dodge*, 2011 ME 47, ¶¶ 13-21, 17 A.3d 128; *McConkie*, 2000 ME 158, ¶¶ 8-11, 755 A.2d 1075.

18

confesses.[12]  *See, e.g.*, *Wiley*, 2013 ME 30, ¶ 31, 61 A.3d 750; *Theriault*, 425 A.2d at 990; *Tardiff*, 374 A.2d at 600-01; *cf. Lavoie*, 2010 ME 76, ¶ 21, 1 A.3d 408;

[¶30]  The determination of the extent to which a false promise of leniency has *induced* a defendant's confession is an issue where some clarification is needed.   Although we have stated that only those false promises of leniency that played a role in the defendant's decision to confess can render a confession involuntary, *see Tardiff*, 374 A.2d at 601, we have been less than entirely clear about how and where that determination of the effect of improper state action is to be made.

[¶31]  In *Tardiff*, *McConkie*, and *Dodge*, after concluding that some law enforcement actions had been improper, we ruled, as a matter of law, that the defendants' statements were involuntary and should therefore have been suppressed.[13]   We did so without any discussion about whether the

---

[12]  We agree with the California Supreme Court's statement that

[t]he line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.

*People v. Hill*, 426 P.2d 908, 916 (Cal. 1967).

[13]  For example, in *State v. Tardiff*, we stated:

defendant's confession had occurred *as a result* of that improper action. In *Wiley*, based on *our* "experience and common sense," we determined that the defendant's confession was involuntary. 2013 ME 30, ¶ 30, 61 A.3d 750.

[¶32] As we noted earlier, in the 1977 decision where we seemed to distinguish the question of whether a confession had been motivated by improper police tactics from the tactics themselves—as though they were separate determinations—we also stated that the determination of voluntariness was entirely a question of fact. *Tardiff*, 374 A.2d at 600-01. Twenty years later, in *Coombs*, we explained our adoption of a bifurcated approach to the standard of review in a voluntariness determination. 1998 ME 1, ¶¶ 7-9, 704 A.2d 387. We referred to *Miller v. Fenton*, 474 U.S. 104 (1985), with its explanation of the need for "plenary federal review" of state court determinations of voluntariness:

> [T]he nature of [the] inquiry itself lends support to the conclusion that "voluntariness" is a legal question meriting independent consideration in a federal habeas corpus proceeding. Although sometimes framed as an issue of "psychological fact," the

---

[W]e conclude that the defendant's confession was involuntary as a matter of law. . . . Although there was testimony indicating that the defendant may have been contemplating confessing, the fact remains that he did not do so until after he had been led to believe by the police that he would be charged with only one offense of his own choice, rather than three. *The evidence thus establishes a legally impermissible promise of leniency by the police which preceded the defendant's confession.*

374 A.2d 598, 601 (Me. 1977) (emphasis added).

> dispositive question of the voluntariness of a confession has always had a uniquely legal dimension.

*Coombs,* 1998 ME 1, ¶ 9, 704 A.2d 387 (quoting *Miller*, 474 U.S. at 115-16). Relying on that reasoning, we reiterated that "the dispositive issue of the voluntariness of a confession, although based on all the facts and circumstances surrounding the confession, is a legal issue warranting independent appellate review." *Id.*

[¶33]  Despite the clear adoption of the bifurcated standard, we have not precisely defined the contours of the analysis of the causal nexus between the conduct of law enforcement officers and the defendant's decision to make incriminating statements.  Our lack of clarity may be grounded in confusion about the precise location of the line between the facts to be determined—exclusively the task of a trial court—and the legal question of the "ultimate determination regarding voluntariness," *Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595.

[¶34]  We clarify today that although the determination of the historical facts underlying a question of voluntariness must be made by the trial court, and will be reviewed deferentially, the "psychological fact" of the voluntariness of a confession is a determination of law and is subject to de novo review.  *See, e.g., Miller*, 474 U.S. at 115-17; *Bryant*, 2014 ME 94, ¶ 15,

97 A.3d 595; *Dodge*, 2011 ME 47, ¶ 10, 17 A.3d 128; *Coombs,* 1998 ME 1, ¶ 9, 704 A.2d 387.

[¶35] We also clarify that the degree to which police conduct appears to have motivated the defendant's decision to confess is one of the factors to be considered by a court in determining the *legal* question of whether that conduct constituted an improper inducement and, thus, the extent to which the officer's statements will play a role in the ultimate voluntariness determination.

2.     Characteristics of the Defendant

[¶36]  When a criminal defendant moves to suppress a confession, alleging that it was involuntary because of a due process violation, the trial court addresses "the totality of the State's actions in obtaining the confession." *McConkie*, 2000 ME 158, ¶ 9 n.3, 755 A.2d 1075 (quotation marks omitted). As we have already discussed, the voluntariness determination pursuant to this approach may include consideration of

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and *mental health, emotional stability*, and conduct.

*George*, 2012 ME 64, ¶ 21, 52 A.3d 903 (emphasis added) (quotation marks omitted).

[¶37]   Like courts in other jurisdictions, we consider a defendant's cognitive ability as part of the voluntariness determination.  In *United States v. Preston*, the United States Court of Appeals for the Ninth Circuit vacated a conviction that was based on the confession of a defendant who had an IQ of 65, was easily manipulated, and was subjected to confusing and high-pressure interrogation techniques.  751 F.3d 1008, 1010-28 (9th Cir. 2014) (en banc). "Even if we would reach a different conclusion regarding someone of normal intelligence," the court stated, "we hold that the officers' use of the methods employed here to confuse and compel a confession from the intellectually disabled eighteen-year-old before us produced an involuntary confession."  *Id.* at 1028.

[¶38]  Similarly, the Kansas Supreme Court reversed a conviction based on a confession where the defendant had an IQ of 76 and was subjected to some degree of police coercion—even though the officers' "threats and promises [alone] may not [have been] sufficient to show coercion."  *State v. Swanigan*, 106 P.3d 39, 42, 45-54 (Kan. 2005).   Likewise, the Wisconsin Supreme Court uses a totality of the circumstances test in which the

defendant's characteristics are balanced against the pressure exerted by law enforcement. *State v. Hoppe*, 661 N.W.2d 407, 414 (Wis. 2003). The court explained:

> The balancing of the personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant. When the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the "voluntariness" calculus.

*Id.* at 415. Relevant personal characteristics "include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." *Id.* at 414.

[¶39] With the clarifications explained above, and recognizing the need to consider law enforcement's actions vis-à-vis each defendant's characteristics, we apply the law to the undisputed facts.

B.     The Voluntariness of Hunt's Incriminating Statements

[¶40]     Hunt contends that his incriminating statements were involuntary because the detectives improperly induced his confession by their assurances that if he confessed to sexual contact with the victim, he would not have to register as a sex offender. He also argues that the statement he made after the first detective asked why he did not confess earlier in the interview—"Like [the second detective] said, that I'm not even close to being

on that list"—demonstrates that those false promises of leniency motivated his decision to confess. We agree and, considering the totality of the relevant circumstances, we conclude that the court erred when it determined that Hunt's confession was made voluntarily.

[¶41] Here, based on the facts found by the suppression court, the circumstances are as follows. Hunt voluntarily went to the police station for questioning that lasted around two hours. He was not in custody, and was told that he could terminate questioning and leave at any time. At the beginning of the interrogation, the officer recited *Miranda* warnings to Hunt and Hunt indicated that he understood them. Two officers were involved in the questioning, although Hunt was questioned one-on-one. The officers persisted in their questioning despite Hunt's initial denials of the allegations of sexual assault. Hunt has "less than average" cognitive skills—one report admitted at the motion hearing indicated he had a composite IQ score of 81 and another reported a score of 75.

[¶42] Although the officers made no direct *promises* to Hunt, in response to his concerns about being placed on "the list," the officers made statements assuring him that if he confessed to sexual contact with the victim, thereby taking the officers up on the one-time "opportunity" they were

offering him, Hunt would not be subject to the sex offender registration requirements. Based on what they told him, Hunt could "reasonably believe [that the officers] had the authority or power to" relieve him from the registration requirements if he confessed to the allegations, *see Tardiff*, 374 A.2d at 601, and also that "the list" was a component of a possible criminal sentence.[14] The first detective did not tell Hunt that "we're not in control of that list" until after Hunt confessed.[15] Moreover, when asked why he had decided to confess, Hunt explained to the first officer that he understood that the second detective had told him that he was "not even close to being on that list." The officers' statements regarding "the list," if not sufficiently definite to constitute false promises of leniency, were perilously close. And, given Hunt's stated reliance on his understanding of their

---

[14] Hunt's sex offender registration is governed by the Sex Offender Registration and Notification Act of 2013 (SORNA), 34-A M.R.S. §§ 11271-11304 (2015). *See* 34-A M.R.S. § 11272(1). In ways not relevant to this appeal, portions of SORNA have been amended since Hunt's conviction and sentencing. *See, e.g.*, P.L. 2015, ch. 280, § 16 (effective Oct. 15, 2015). According to the statute, "[t]he court shall notify the offender at the time of sentence of the duty to register." 34-A M.R.S. § 11282(1). Hunt's "notice of duty to register" identified him as a "Tier III registrant," requiring him to register for the rest of his life and to verify his registration every ninety days. *See* 34-A M.R.S. §§ 11273(16)(A), 11282(7)(A), 11285(5). Sex offender registration is a consequence that applies to a convicted sex offender because of his conviction, and it is a consequence that may affect an offender far longer than his prison sentence.

[15] *See Dodge*, 2011 ME 47, ¶¶ 14-16, 17 A.3d 128 (holding that statements the defendant made after an officer misled him to believe the conversation was confidential, but *before* the officer "correct[ed]" himself, were properly suppressed); *cf. State v. Wood*, 662 A.2d 908, 911 (Me. 1995) (concluding that a confession was voluntary where officers told the defendant that he was "not in trouble" for possessing a handgun used in a murder but also "repeatedly told [him] that they had no control over charging decisions or sentencing" (quotation marks omitted)).

assurances, we cannot disregard those statements in considering the totality of the circumstances.

[¶43] Although the officers' statements might not have rendered a different defendant's confession involuntary, the issue of Hunt's cognitive limitations also plays a significant role in our analysis. As the Supreme Court of Wisconsin stated, "[w]hen the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the 'voluntariness' calculus." *Hoppe*, 661 N.W.2d at 415. Although no single factor renders Hunt's confession involuntary, the totality of the circumstances—in particular, the officers' misleading statements in light of Hunt's cognitive disability and his apparent reliance on their representations—rendered Hunt's incriminating statements involuntary as a matter of law.

[¶44] Given the values that the exclusionary rule for involuntary confessions serves to protect, *see McConkie*, 2000 ME 158, ¶ 9 & n.3, 755 A.2d 1075; *Mikulewicz*, 462 A.2d at 500; *Collins*, 297 A.2d at 634 n.13, we must conclude that the suppression court erred when it denied Hunt's motion to suppress the evidence of his incriminating statements. We therefore vacate

the judgment of conviction and remand the case to the trial court for a new trial.[16]

The entry is:

> Judgment of conviction vacated. Remanded for further proceedings consistent with this opinion.

---

**On the briefs:**

Verne E. Paradie, Jr., Esq., Paradie, Sherman, Walker & Worden, Lewiston, for appellant Timothy Hunt

Stephanie Anderson, District Attorney, and William J. Barry, Asst. Dist. Atty., Prosecutorial District No. Two, Portland, for appellee State of Maine

**At oral argument:**

Verne E. Paradie, Jr., Esq., for appellant Timothy Hunt

William J. Barry, Asst. Dist. Atty., Prosecutorial District No. Two, Portland, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2013-6687
FOR CLERK REFERENCE ONLY

---

[16] The State does not argue that, if erroneous, admission of Hunt's confession constituted harmless error. *See Fulminante*, 499 U.S. at 306-13; *State v. Ayers*, 433 A.2d 356, 362 (Me. 1981). And, because we vacate Hunt's convictions based on the denial of his motion to suppress evidence of his confession, we do not discuss his arguments regarding either the trial court's exclusion of his expert's testimony or the sufficiency of the evidence presented at trial.