STATE OF MAINE
KENNEBEC, SS.

UNIFIED CRIMINAL COURT
AUGUSTA
DOCKET NO. CR-2020-429

STATE OF MAINE

V.

GAVIN T. LOABE

**ORDER ON MOTION TO SUPPRESS**

## INTRODUCTION

Before the court for resolution is the Defendant (Gavin Loabe's) Motion to Suppress statements made by him to detectives with the Waterville Police Department on March 6, 2020. This matter was scheduled for an evidentiary hearing on October 16, 2020. As the hearing was about to begin, however, the parties agreed that the court could view and listen to the video recording of the interrogation conducted by Detectives Damon Lefferts and Duane Cloutier, marked and admitted into evidence as State's Exhibit 1. The court has viewed the recording in its entirety and now makes the following factual findings.[1]

## FINDINGS OF FACT

The video begins at 4:21:00. The Defendant can be seen entering the room at 4:22 in handcuffs. He was left alone in the room until 4:25:30 when Det. Cloutier entered the room to give Loabe a cup of coffee. At 4:27:30, Det. Cloutier again entered the room and removed the handcuffs from Loabe's wrists. Loabe was again left alone in the room (with his head occasionally resting on the table) until 4:38:40

---

[1] The court was not able to view the video on its Judicial department issued laptop, but was able to view it on its home desktop computer.

when the two detectives entered the room, at which point the sound on the video began.

Det. Lefferts was dressed in a black shirt and initially took the lead in questioning Loabe. Det. Cloutier was wearing a baseball cap and was seated just off camera, sometimes partially in view. Lefferts and Loabe engaged in brief small talk, with Loabe explaining that he is 18 years of age, lived in Mercer, and had not graduated from high school but was attending or planning to attend Kennebec Valley Community College. At 4:39:46, Loabe said: "Can I ask why I'm here?" Det. Lefferts responded by asking Loabe whether he had heard about "the shooting," and Loabe replied that he had. It is apparent that both men were referring to an incident that happened the previous Friday, February 28, 2020, during which shots were fired into a home on Summer Street in Waterville, one of which struck a 7 year-old-girl.

At 4:40, Det. Lefferts read Loabe the *Miranda* warnings line-by-line. Loabe indicated that he understood each right, and at 4:41:37 he signed a waiver and agreed to speak with the detectives. Lefferts began the conversation by asking Loabe why he "thinks he is here," to which Loabe replied: "No idea." Lefferts asked what Loabe knew about the shooting. Loabe said he had read an article "about a little girl getting shot." Lefferts expressed the view that the shooting "seemed to be an accident," and then asked Loabe to describe what he did and where he was the previous Friday (2-28-2020).

Loabe said he had gone to visit his girlfriend, Lyric McCarthy, in Skowhegan at around 11:30 a.m. They made a quick trip to the local Dunkin' store and then returned to Lyric's trailer, where they spent the rest of the day together "chilling" and watching Netflix. He said he left Lyric's place around 5:30 – 6:00 p.m. and returned home, where he and Lyric did the same thing, i.e., watched Netflix. He said he was driving his father's Toyota Tacoma and never went anywhere else that day.

At 4:47:10, Lefferts again asked Loabe why he thinks he sitting in that "seat" in the interview room. Loabe responded: "No clue." A few seconds later, Lefferts brought up the name of Jeff Madore. Loabe responded by saying he did not know Madore, had never met him and had only heard of him by reputation. A couple of minutes later, Lefferts brought up the name of Thomas Vigue. Loabe denied knowing him and further denied knowing that Lyric and Vigue might have dated in the past.

At 4:54:43, Lefferts walked out of the room. He returned 30 seconds later and asked Loabe to describe his father's truck. After leaving the room again, Lefferts returned a few seconds later holding some photographs. Depicted in the photographs was the truck Loabe was driving on February 28, 2020. Lefferts asked Loabe: "How is your truck in Waterville?" Loabe said: "I don't know." Lefferts's tone became more confrontational at this point, as the photos appearred to show Loabe's truck in Waterville at or around the time of the shooting incident, when Loabe had claimed he was with his girlfriend in Skowhegan.

At 4:57:49, Det. Cloutier spoke up and told Loabe: "Your story was planned." Lefferts told Loabe he does not know whether "you were the driver or the actor." Loabe said: "That's my story. I'm sticking with it. I'm speechless. I have no clue how my truck got there."

Over the next few minutes, the detectives encouraged Loabe not to throw his life away, that he's not a "shithead," that he has his whole life in front of him, and that the shooting of the little girl was an "accident." When directly told that he was "involved" in the shooting, Loabe denied it. (5:01:55). Det. Lefferts told Loabe that he had the chance to choose the "good" path in the road, rather than the "criminal" path, and that he'd be better off telling the truth. Loabe again said he was "sticking to my first story," and that he did not know who took his truck. He acknowledged,

however, that it "doesn't look good for me." At 5:06:36, Lefferts walked out of the room.

At 5:09:26, Cloutier left the room to get Loabe some water, and a couple of minutes later Loabe left the interview room for a bathroom and smoke break. At 5:16:10, both detectives and Loabe were back in the room. Lefferts asked Loabe to start over and describe his activities on Friday, February 28, 2020. When Loabe said that he was "sticking to the story," Lefferts told him he was "full of shit," and was throwing his life away. Lefferts continued to urge Loabe to tell the truth and asked what Loabe's father and grandfather were going to think. The two men argued back and forth for several more minutes, with Lefferts telling Loabe to think of his future, and to own up to his mistakes, while Loabe told Lefferts that he was playing "mind games" with him. When Lefferts asked if he needed more time to think about it, Loabe said: "I don't know what to think. Just wondering when I get to go home." (5:22:20). Lefferts went out of the room, leaving Cloutier alone with Loabe. (5:24:34).

Loabe immediately asked: "What do you want?" Cloutier said: "The truth, Gavin, the truth." (5:24:40) Loabe acknowledged that he didn't know "what to think about that picture." Loabe asked: "What's going to happen if I give the truth?" Cloutier replied that the truth would look "a lot better" when we're talking to the District Attorney. Loabe interrupted and said: "And I'm also going to be doing time?" Cloutier said he did not know what the result was going to be, but he could tell him that it would be a lot worse if you "totally lie about it." (5:25:01).

At 5:27, Loabe said: "If I said I did it, I'm going to be in cuffs to Kennebec." Cloutier said: "I don't know what's going to happen, but it's better to be honest." Cloutier also returned to the theme that Loabe's father and grandfather would "do the right thing." Loabe wanted to know whether the photos were the only pieces of evidence the police had. Cloutier assured him that was not the case. Cloutier said

4

there were "lots of factors" that would determine what happened next, including Loabe's honesty. On the other hand, Cloutier remarked, "lying is a mistake." (5:31)

At about this 5:32:39, Lefferts reentered the room with another photograph and showed it to Loabe. Lefferts walked out of the room seconds later. Loabe asked: "What's the worst that will happen to me?" Cloutier said that bail was "not out of the realm of possibility." (5:34:39) Cloutier continued to encourage Loabe to be honest with them so they could talk with the D.A. and be on Loabe's side. Throughout this time, Cloutier generally told Loabe that it was better to be honest, to get it off his chest, to think about what his father and grandfather would do, and the longer it goes on, the worse it would get.

At about 5:39:21, Loabe made a comment about being charged with something. Cloutier responded: "Yeah, being charged with something is one thing, being convicted of something is another thing." At 5:39:34, Loabe said: "So, they're sending me to Kennebec tonight or what?" Cloutier said: "No, man. We just want to figure out what happened. A mistake was made." Cloutier continued to urge Loabe to be honest so that "we can work with you. We can be in your corner with the D.A."

This line of conversation continued for several minutes. At 5:42, Loabe said: "I'm going to get fucked dude." Cloutier said: "No, you're not." Loabe said: "I am." The detective asked Loabe if he believed in God, and assured him that while everyone must answer for the mistakes they've made, "God forgives everyone, as long as you're honest and truthful." (5:42:40) Loabe asked: "You know what's in store for me?" The detective replied: "get ahead of it before it becomes something you can't undo. Right now, you have the power to tell the truth. We'll be talking to the D.A. about your honesty, because obviously there's going to be a time when you go to court to answer to whatever charge it is, and it will be worse if you lie." (5:44:30)

5

Loabe probed Cloutier to find out whether the police only had the pictures as evidence. Cloutier said that was not true. At 5:46:40, Loabe said he was confused. "I don't know what to do." Cloutier said: "It's easy to tell the truth. Do the right thing."

At 5:47:34, Loabe said: "I'm already going to county tonight." Cloutier said: "I don't know what the end is going to be, but I know it's going to be a lot worse if you continue to lie." At 5:48, Loabe said: "what if I told them I was the passenger, I'd still be going to county." Cloutier said: "I believe you, I believe you. If you let somebody drive your father's truck, be honest about it." At 5:48:22, Loabe told the detective: "I was in the passenger seat."

Loabe then recounted the following version of events. He was a passenger and did not fire a shot. He initially refused to give the name of any other person involved. He said Lyric received a text message from Thomas Vigue asking her if she wanted to have sex. Loabe saw the message and it upset him. He "hit up my boy" to beat up Vigue. Loabe insisted that all he wanted to do was give Vigue an "ass beating," but his unnamed accomplice had a gun and "the next thing I know, pop, pop." Loabe claimed that he had no idea that the driver had a gun.

At 5:53, Loabe said: "that's as much information as I can give you." He said the gun was thrown and he did not know where it was. Upon further questioning, Loabe said he thought the gun was a "hi-point" that came from Macy Chesley. At 5:59, Loabe said the shooter was "Jeff." Loabe was unable to say where he picked up Jeff, because he was unfamiliar with the Waterville area. Det. Cloutier was dubious of this story and asked Loabe how it could be proven that Jeff was the shooter as opposed to Loabe. Loabe claimed that he had heard that Jeff was a "fighter" so he went over to Jeff's place unannounced and enlisted him to help him beat up Thomas Vigue. According to Loabe, Jeff agreed and even offered to drive Loabe's vehicle.

At 6:20:43, Cloutier left the room, leaving Loabe alone. At 6:27:22, another smoke break was taken, which lasted until 6:32. At 6:33:43, Cloutier returned to the room with another water for Loabe. At this time, it was only Cloutier with Loabe. Det. Cloutier asked Loabe to "start right from the beginning. I want honesty." Loabe at first declined to give any other names. When pressed by the detective, Loabe admitted that "Jeff" was not involved at all. (6:43 – 6:44). Cloutier left the room at 6:45:50. Det. Lefferts entered the room at 6:48. Loabe asked Lefferts if "I'm going home tonight or am I going to Kennebec?" Lefferts did not directly answer the question, but said he needed to make some calls and another detective needed to talk with Loabe too. Lefferts said that he understood from Cloutier that Loabe was "protecting" his "home boy" or something. Loabe insisted he "can't give names." At 6:50, Det. Cloutier returned to the room.

Loabe continued to refuse to provide any names – "I can't do it. I'm not that type of person." He said he was in the passenger seat and "my buddy was driving," but "I'm not going to give my boy up." Loabe also maintained that he had no knowledge that his companion had a gun, or where the gun was. When asked who owned the gun, Loabe said: "Tristan Boyer." (6:54:50).

Loabe continued to tell the detectives that he would not give up "my boy." Cloutier left the room again at 6:57:00. Then at 6:57:13, Loabe said: "I'm not giving my boy up, so I pulled the trigger." Lefferts said: "Don't pull that shit with us. We need to know what happened." Loabe said: "Dude, I pulled the trigger, let's get it over with." Lefferts said: "That's not going to fly." Lefferts said that when the police got ahold of the "other guy, he's gonna turn." Lefferts left the room again at 6:58:14.

Cloutier re-entered the room at 6:59:29. Loabe immediately said to him: "Can you put me in cuffs?" Loabe said: "I already said I did it." Cloutier said: I know you said that. Tell me, if you did it, where's the gun?" Loabe said he did not know.

7

Cloutier asked for details because Loabe had told so many stories. Loabe said: "I gotta tell different stories, and switch it up." Cloutier replied: "Don't do that. You can tell the truth." At 7:00:40, Loabe said: "I'm going to get fucked, you know that. I know that." Cloutier interjected: "If you are honest, it won't be as bad." Loabe continued by saying: "I know I'm going to fucking county tonight. I'm just waiting." The detective replied: "I want you to be 100% honest."

When Cloutier kept encouraging Loabe to provide truthful details of what happened and how, Loabe just said: "Well, I said I did it." At 7:03:01, Loabe said: "All I can say, I did it. Alone. That's what I got to say." Cloutier said: "No, that's not what you got to say." When the detective said again: "If you did it, where's the gun?" Loabe continued to say he did not know.

Loabe and the detective went back and forth again for several minutes in this same vein, with Loabe insisting he would not "rat" out anyone, and Cloutier exhorting him to be honest and tell the truth. At 7:13:50, Loabe said: "I just want to go home." The detective again said: "just do the right thing. Keeping lying is not helpful." Loabe claimed that the reason he would not give up his "buddy's" name was because he (the buddy) had a child and one on the way. (7:21 – 7:23).

At 7:29:05, Loabe said he wanted to tell the detectives the name of his accomplice, "but I can't." Then, at 7:30:11, Loabe asked: "What if I give you the name?" The detective said: "I need 100% truth. Then I can go to the D.A., say it was tough, but he told the truth." Loabe acknowledged that when he first walked into the interview room, his "gut" told him to say nothing. He felt that his life was already thrown away. The detective told him that was not true. Loabe said he wanted to give the name, but was concerned that it would all come back on him in court. The detective reminded Loabe that he had been read his rights at the beginning and that he agreed to talk, and Loabe acknowledged that.

8

Another smoke break was taken at 7:35:55, which lasted until 7:42:40. Cloutier wanted Loabe to start from the beginning and be 100% honest. At 7:44, Loabe said that "Jeremiah" followed him out of Lyric's trailer. They swapped places on the way to Waterville. They made a stop along Kennedy Memorial Drive. Loabe still said that his plan was to just fight Vigue. As they approached where they thought Vigue lived, he told Jeremiah to pull over. But Jeremiah said "no" and fired the shots. Again, Loabe said he did not know there was a gun involved and he did not expect what actually happened. He also maintained that he did not know where the gun was. He claimed that this version of events was "100% full honesty." (7:58:12).

At 7:59, Cloutier again offered Loabe food and water and left the room. Cloutier was back in the room at 8:07:35 and then left again at 8:13:59. About ten minutes later, one of the detectives told Loabe he could rest his head on the table if he wanted to. Minutes later, Loabe got down on the floor to rest. The lights in the room went out at 9:17:03. Loabe left the room at 10:01:38 and returned two minutes later and again rested on the floor. At 10:15:39, Sgt. Caron entered the room to complete and serve Loabe with paperwork, including a charge of attempted murder.[2] The video ended at 10:15:59.

## DISCUSSION

Loabe contends that his statements to Detectives Lefferts and Cloutier should be suppressed on the basis that they were not voluntary. Specifically, he maintains that his statements were the product of improper inducements or promises of leniency made by the detectives. He points particularly to that portion of the interrogation when he questioned whether he would be taken to "Kennebec," i.e.,

---

[2] Loabe was subsequently indicted for one count of Elevated Aggravated Assault (Class A) in violation of 17-A M.R.S. § 208-B(1)(B).,

the county jail, that night and the detective replied: "No, man. We just want to figure out what happened." (5:39:34) He further argues that this "assurance" that he was not going to the jail was confirmed when the detective disputed that he was "gonna get fucked" and thereafter told him that God would forgive him. In combination with his young age, his lack of a formal education and the overall circumstances of the interrogation, Loabe asserts that the improper inducements made by the detectives rendered his statements involuntary. Stated otherwise, he claims that the State cannot meet its burden of showing the voluntariness of his statements beyond a reasonable doubt.

In *State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911, the Law Court clarified the "distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice." The latter situation employs a due process analysis and seeks to address the question of whether a defendant's "statements were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair." *Id.* The Court reaffirmed its holding in *State v. Mikulewicz*, 462 A.2d 497, 500-01 (Me. 1983) that "[a] confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *See also State v. Williams*, 2020 ME 128, ¶ 43, ___ A.3d ___.

The court must focus on "the totality of the State's actions in obtaining the confession." *Hunt*, 2016 ME 172, ¶ 21; *State v. McConkie*, 2000 ME 158, ¶¶ 4, 9, 755 A.2d 1075. A number of relevant factors may be considered by the court in making the voluntariness assessment, including:

> the details of the interrogation; duration of the interrogation; location
> of the interrogation; whether the interrogation was custodial; the

recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903.

It is the State's burden to demonstrate that a statement is voluntary beyond a reasonable doubt. *State v. Annis*, 2018 ME 15, ¶ 13, 178 A.3d 467. *State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972).

With specific reference to promises or inducements made to a suspect by police, the Law Court has cautioned that "*false promises of leniency that induce a confession* are improper and thus will weigh significantly into our consideration of the totality of the circumstances in determining whether a confession must be suppressed." *Hunt*, 2016 ME 172, ¶ 29 (italicized language in original). The Court provided guidance on this issue by defining a "false promise" as one that "involves a benefit that could not be delivered – or is not in fact delivered – by the government agent making the promise, or when the agent has no authority to give the defendant what was offered. A promise involves leniency when it suggests that the process of prosecution or sentencing will somehow be 'better' for the defendant if the defendant confesses." *Id.* (citations omitted). On the other hand, generalized suggestions and/or exhortations to tell the truth are not impermissible. *Id.* at ¶¶ 23-24.

As noted above, the court must assess the totality of the circumstances in order to make a judgment as to whether the State has proved the voluntariness of a defendant's confession beyond a reasonable doubt. No one factor, in isolation, necessarily controls that determination. After reviewing the DVD, and after considering all of the circumstances in their entirety in this case, the court is satisfied that the State has met its burden of proof.

As an initial matter, many of the factors pertinent to the voluntariness inquiry are worthy of note here. The duration of the interview was almost 4 hours. It took place at the police department, and Loabe was clearly in custody. Loabe was read the *Miranda* warnings and agreed to waive his rights and speak with the detectives. Two detectives were involved. While the detectives, most particularly Det. Lefferts, were firm and persistent, they were not threatening or coercive towards Loabe. The tone and tenor of the interview was forthright and direct. The detectives made it clear that they thought Loabe was somehow involved in the shooting incident of February 28, 2020. At times, Det. Lefferts confronted Loabe when he believed he was not telling the truth. Nevertheless, the detectives generally treated Loabe respectfully. The Defendant was 18 years of age, but not a high school graduate. He appeared to be in good physical condition. Nothing in the recording suggests that Loabe suffered from any mental illness or disability or was emotionally unstable or particularly vulnerable at the time of the interrogation. Loabe was coherent, lucid and quite capable of understanding the questions posed to him by the detectives, and giving the answers he wanted to give at the time. Although at a few points during the interview he said that he was "confused," this appeared to be due to the fact that he had told the detectives a variety of different stories

The court finds no impropriety in the appeal to Loabe to consider what his father and grandfather would do under the same circumstances. While this tactic was clearly intended to play on Loabe's emotional attachment to his father and grandfather, it was, in essence, an admonition to Loabe to tell the truth and take responsibility for his own conduct.

The primary area of dispute is whether the detectives made false promises of leniency to Loabe that induced him to confess or make incriminating statements.

In the court's view, the statements made by the detectives must be considered in the context of the entire interview. Loabe focuses on an isolated remark by Det.

Cloutier in response to his question: "So, they're sending to Kennebec tonight or what?" The detective replied: "No, man. We just want to figure out what happened. A mistake was made." In support of his motion to suppress, Loabe points to this language as amounting to a promise that if he confessed he would not go to the county jail. But viewed in context, the detective's response did not constitute such an improper promise.

The entire thrust of the interrogation was to determine what happened, why it happened and what role Loabe played in the incident of February 28, 2020. Throughout the interview, the detectives constantly entreated Loabe to tell the truth because, among other things, it was the "right thing to do." Det. Cloutier's almost reflexive response – "No, man, we just want to figure out what happened. A mistake was made" – cannot reasonably be understood as any type of promise at all. Rather, the detective was trying to re-focus Loabe to the importance of being truthful. Viewed in isolation, and out of the context of the entire 4-hour interview, the remark "No, man" can be argued to imply that the detective was telling Loabe that he was not going to "Kennebec" that night. But viewed in its rightful context, the remark was not a promise but a statement to Loabe that he needed to focus on telling the truth and not the immediate consequence of whether he was going to jail that night.

That this is the proper interpretation of the detective's remark is supported by the fact that Loabe made several subsequent references to going to "county," and made it clear to the detectives that he knew he was going to jail that night. In other words, Loabe did not understand the remark as any type of promise by the detective. And it is noteworthy that whenever Loabe brought up the subject of going to jail that night, the detectives merely responded by telling him he needed to be honest and truthful. In short, the detective's remark was not a "concrete promise of leniency." *State v. Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445; *State v. McNaughton*, 2017 ME 173, ¶ 37.

Finally, the court is satisfied that the remark "No, man," did not motivate or induce Loabe to confess. This is not a situation like the ones in *Wiley, Hunt* and *Tardiff*, where the defendant was highly vulnerable and/or emotionally fragile and was primarily focused on a specific promise of leniency. Loabe did not structure his confession/statements in order to fit within some perceived promise by the detectives. On the contrary, at various times during the questioning, Loabe asked: "What if I said" this or "What if I said" that? Each time he did so, the detectives responded by telling him to be "100% honest." This case is more like *State v. McNaughton,* 2017 ME 173, ¶¶ 36-37, 168 A.3d 807, than those cases where a law enforcement officer made specific promises of leniency that "jeopardized the voluntary nature of a defendant's statements." *Compare Hunt*, 2016 ME 172, ¶¶ 4-10, 41-44; *State v. Wiley,* 2013 ME 30, ¶ 21, 61 A.3d 750; *State v. Tardiff*, 374 A.2d 598, 600-01 (Me. 1977).

The court finds that the State has proved beyond a reasonable doubt, that Loab's statements were the result of a rational mind, were not the product of coercive police conduct and, under all the circumstances, their admission would be fundamentally fair.

## CONCLUSION

The entry is: Defendant's Motion to Suppress is DENIED.

Dated: November 16, 2020

William R. Stokes
Justice, Superior Court

14