STATE OF MAINE
KENNEBEC, SS.

UNIFIED CRIMINAL COURT
AUGUSTA
DOCKET NO. CR-2016-2466

STATE OF MAINE

V.

**DECISION AND ORDER**

ERIC SAY

## INTRODUCTION

Pending before the court for resolution is the Defendant's Motion to Suppress recorded statements he made to Detective Tori Tracy of the Augusta Police Department on May 17, 2016. A testimonial hearing was held on June 4, 2018 at which the court received the testimony of the following witnesses: Detective Tracy; Toni Cunningham; Bunvandy Say, and; Dr. Ribert Riley, Psy.D. State's Exhibit 1, being the audio recording of Detective Tracy's interview of the Defendant, was admitted into evidence without objection. Also admitted without objection were two reports authored by Dr. Riley, the first being dated April 20, 2017 which was a standard competency evaluation, and the second dated June 14, 2017 which was a more comprehensive neuropsychological evaluation.[1] The court has received and reviewed the post-hearing memoranda submitted by the parties.

The court has listened to the recorded interview of the Defendant multiple times and has reviewed, for a second time, Dr. Riley's reports. The court has also reviewed its notes of the testimony of all of the witnesses presented at the hearing.

---

[1] In an Order dated August 30, 2017, the court (E. Walker, J.) determined that the Defendant was competent to stand trial.

Based upon the evidence presented, and after consideration of the parties' written arguments, the court makes the following findings of fact.

## FACTUAL FINDINGS

In November 2015, Detective Tracy received information from the State of Florida relating to an interview that had been conducted with the alleged victim (the Defendant's niece) named in the Indictment in this case. As a result of that information, Det. Tracy made several attempts to contact the Defendant, but was unsuccessful until May 17, 2016 when she went to his residence and he came to the door in response to her knock. Det. Tracy had activated her audio recorder prior to approaching the house. The total length of the recording is 16 minutes, 51 seconds.

After confirming that the person who came to the door was Eric Say, Det. Tracy asked him if he had a few minutes to talk with her. He agreed and the two of them spoke on the porch. The detective asked the Defendant if he knew why she wanted to speak with him – he said he did not. The officer then explained that the Defendant's niece had come forward with information about something that had happened between them some time ago. The Defendant volunteered: "I did something wrong." The detective immediately told the Defendant that no matter what he said to her she would be leaving by herself and he would not be taken into custody.

The Defendant said that "it was a long story," that his whole family had talked about it, that he "had done a really bad thing" to his niece, that he does not do that anymore, and that after talking with his family, including his sister (the mother of his niece), "everything is fine." The Defendant repeated that his whole family had talked about it. At that point (at 2:49 of the recording) Det. Tracy said: "But you need to talk about it with me."

The detective asked the Defendant to tell his side of the story. The Defendant expressed a lack of memory about the incident because it happened a long time ago

2

but agreed that he would have been 19 and his niece was 7 at the time. He described how he would babysit his niece and they would play video games in his bedroom. As Det. Tracy asked for specifics, the Defendant was reluctant to discuss it, stating: "I don't know." Det. Tracy said (at 4:34 of the recording): "Well, you do know, and you know it was wrong, and you're kind of uncomfortable talking about it, but we have to talk about it Eric." The Defendant responded: "It was a mistake."

Because of the Defendant's discomfort with discussing the details of what had happened with his niece, Det. Tracy told him what she knew based on what his niece had said and asked the Defendant to correct anything that was not accurate. In particular, Det. Tracy reported that the Defendant's niece had said that the Defendant and she had sexual intercourse when they were younger. Before the detective could finish her sentence, the Defendant said: "Yes, I'm not going to lie." He further acknowledged that he put his penis inside his niece's vagina only once. The Defendant explained that when his older sister found out what had happened, she was "pissed," and "I was too, because I was wrong." And the whole family had talked it over.

The Defendant denied otherwise touching his niece and maintained that the intercourse happened one time. He could not explain how he let himself do what he did, but he returned to the theme that he had apologized to his sister (and wanted to apologize to his niece), they had talked "one-to-one," and "everything is alright now" because "we talked about it."

Det. Tracy emphasized to the Defendant at that point (6:46 of the recording) that what had been done was illegal, even though the family may have talked about and "dealt" with it within the family. Throughout the interview, the Defendant repeatedly expressed his awareness that what he had done was "wrong," that it had happened once and that it would never happen again. Det. Tracy explained to the Defendant that she would be writing her report and submitting it to the District

3

Attorney's Office for review and a decision on prosecution. She made no promises of any kind to the Defendant and told him that even though the family may have dealt with it internally, he may have to face further consequences because what he had done was illegal.

The Defendant immediately asked: "What consequences?" Det. Tracy told the Defendant that the offense was called "gross sexual assault" and that it was a Class A felony. The Defendant can be heard saying: "Man." Det. Tracy did say that given his cooperation and remorse, perhaps "they (the D.A.'s Office) may give you a plea – plead it down," although she emphasized that she had no knowledge whatsoever as to whether that would happen. Once again, the Defendant returned to the theme: "what if my parents knew about it and the family had talked about it?" Det. Tracy firmly pointed out that whether his family, including his parents, had talked about the matter was irrelevant to its illegality and the involvement of law enforcement. By this point in the interview, the seriousness of the situation appears to be settling in upon the Defendant

The interview wrapped up with the detective telling the Defendant that if the case is prosecuted she will personally communicate directly with the Defendant. She also encouraged the Defendant to stay in touch with her if he had any questions or if he left the area. At no point during her interview of the Defendant did Det. Tracy administer *Miranda* warnings to him.

At the time of his interview with Det. Tracy the Defendant was 23 years of age. He graduated from high school in 2011 and was in special education classes because of his learning difficulties. Toni Cunningham, a family friend who has known the Defendant since his birth, described him as very quiet, a follower and obedient to those in authority. The Defendant's sister, Bunvandy, described her brother as being a slow learner who finds it difficult to understand multiple

4

directions and who, socially, is more comfortable with those of middle school age rather than adults.

These observations are consistent with those made by Dr. Riley in his two reports and in his testimony. There is no question that the Defendant has cognitive limitations. His Full Scale IQ is in the low average to borderline range (79, or 8th percentile). Dr. Riley pointed out, however, that this IQ number "is essentially a meaningless indicator of his overall ability, as there were widespread discrepancies between specific areas of functioning." For example, his expressive vocabulary was borderline and his Verbal Comprehension Index was borderline to extremely low (3rd percentile). On the other hand, "[o]n a receptive vocabulary task, Mr. Say's performance was low average, and was much improved as compared to his expressive vocabulary," "suggesting that he is able to recognize and understand a higher degree of information than he is able to spontaneously express on his own." This led Dr. Riley to conclude in his neuropsychological report of June 14, 2017 that the Defendant "is able to understand more information than is readily apparent."

Again, these observations are consistent with the court's non-expert evaluation of how the Defendant behaved during his contact with Det. Tracy. The Defendant was "reticent"[2] at times in responding to the detective's questions. This may be a function of his discomfort with discussing embarrassing details of what happened between him and his 7-year old niece. It may also be a function of his wariness in responding to a police officer's questions. And, no doubt it was a function of his limited ability to verbally express what he may want to say.

All of the witnesses called by the Defendant – Dr. Riley, Ms. Cunningham and Ms. Say – spoke of the Defendant's susceptibility to persuasion. Thus, as Dr.

---

[2] Dr. Riley used this word in his reports to describe the Defendant's interactions with him.

Riley observed, the Defendant might have a tendency to interpret the detective's remarks – "you need to talk about it with me" and "we have to talk about it Eric" – as requirements.

The court finds that the Defendant was taken somewhat by surprise when he realized that the matter was not taken care of by virtue of the fact that his parents, his sister and his whole family had discussed it and "everything is fine now." Throughout his short interview with Det. Tracy, the Defendant consistently brought up the fact that the incident with his niece, while wrong, had been talked about within the family and was "alright now."

## DISCUSSION

In *State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911, the Law Court clarified the "distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice." The latter situation employs a due process analysis and seeks to address the question of whether a defendant's "statements were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair." *Id.* The Court reaffirmed its holding in *State v. Mikulewicz*, 462 A.2d 497, 500-01 (Me. 1983) that "[a] confession is voluntary if it results from the free choice of a rational mind, if it not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." A number of relevant factors may be considered by the court in making the voluntariness assessment, including:

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or

6

inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903.

It is the State's burden of demonstrating that a confession is voluntary beyond a reasonable doubt. *State v. Annis*, 2018 ME 15, ¶ 13, 178 A.3d 467. *State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972).

The Defendant has not suggested that Det. Tracy "forced" a confession from him through compulsion. Rather, he asserts that admission of his May 17, 2016 statements to Det. Tracy would be fundamentally unfair under the totality of the circumstances, including his cognitive limitations and the nature of the detective's questioning. In particular, he points to the detective's remarks that "you need to talk about it with me" and "we have to talk about it Eric" as being psychologically coercive.

Applying the various factors to the totality of the circumstances in this case, the court is satisfied beyond a reasonable doubt that the Defendant 's statements were voluntary and were not obtained in violation of due process, nor would their admission be fundamentally unfair. As an initial matter, several of the factors weigh in favor of a finding of voluntariness. The duration of the interview was short – less than 17 minutes in total. The location of the interview was on the porch of the Defendant's residence, a familiar setting. The interview was not custodial in nature, and the Defendant concedes as much. No *Miranda* warnings were recited, but none were legally required because no custodial interrogation took place. On the other hand, the Defendant was told that he would not be taken into custody no matter what he said. Only one police officer was involved in the questioning. Although Det. Tracy was firm in her attempts to have the Defendant describe what happened between he and his niece, she was not aggressive or confrontational and was, at all times, professional, polite and respectful to the Defendant. Det. Tracy engaged in

no police trickery, nor did she make any threats, promises or inducements of any kind. At the time of the interview the Defendant was an adult, age 23 and was a high school graduate.

Balanced against these factors is the evidence of the Defendant's cognitive limitations. The court has no reason to doubt the testimony of Dr. Riley who described, in both his testimony and his two reports, the variability in the Defendant's level of functioning. The Defendant understands more than he can verbally express. Although the Defendant has certain limitations, he is also able to make rational choices. There is no evidence to suggest that Det. Tracy was aware of the Defendant's cognitive deficits when she went to talk with him on May 17, 2016, and there is no evidence whatsoever that Det. Tracy tried to take advantage of the Defendant or exploit his vulnerabilities when she spoke to him.

Rather, Det. Tracy recognized that it was uncomfortable for the Defendant to speak about what he had done to his niece and it was in that context that she made the statement: "but we have to talk about it Eric." (at 4:34 of the recording). Similarly, the detective understood that the Defendant felt that the matter had been dealt with inside of his family, including with his parents and his sister, and "everything is fine." And it was in that context that Det. Tracy said: "you need to talk about it with me." (at 2:49 of the recording). These remarks were not police commands to which the Defendant merely acquiesced – rather, they were more in the nature of efforts by the detective to encourage the Defendant to tell her the truth of what had happened between he and his niece.

Moreover, well before Det. Tracy made these remarks the Defendant had said: "I did something wrong" and he "had done a really bad thing" in connection with his niece. The Defendant was aware from almost the beginning of the interview (if

8

not before that)[3] what Det. Tracy was there to talk about and was not "coerced," subtly or otherwise, into making statements as a result of Det. Tracy's remarks.

The court concludes beyond a reasonable doubt that the Defendant's decision to speak with Det. Tracy on May 17, 2016 was the product of his free choice and rational mind, that it was not the result of coercive police conduct and that admission of his statements to her would be fundamentally fair.

## CONCLUSION

For the foregoing reasons, the entry is:

Defendant's Motion to Suppress is DENIED.

Dated: July 17, 2018

William R. Stokes
Justice, Superior Court

Entered on the docket   7/18/18

---

[3] The evidence indicated that Det. Tracy had tried to make contact with the Defendant on several prior occasions and had left messages for him to call her back. Upon her arrival at the house on May 17, 2016 she asked the Defendant if he had received her messages and he stated that he had called her back but had not left any message for her.

9

**STATE OF MAINE**
**KENNEBEC, ss**

**UNIFIED CRIMINAL COURT**
**LOCATION: AUGUSTA**
**DOCKET NO. CR-2016-2466**

STATE OF MAINE )
)
v. )
)
ERIC SAY )

**ORDER OF COURT REGARDING**
**COMPETENCY**

Hearing on the Defendant's issue of competency was held on August 24, 2017. The Defendant was present and represented by Walter F. McKee, Esq. The State was represented by Assistant District Attorney Frayla Tarpinian.

The Defendant was indicted by the Kennebec County Grand Jury on February 23, 2017, for a single charge of Gross Sexual Assault, Class A, according to 17-A M.R.S.A. §253(1)(C), based on allegations that on a date between April 1, 2011 and May 31, 2013, in Augusta, the Defendant did engage in a sexual act with S.V., not his spouse, who had not in fact attained the age of 12 years.

At hearing, the State presented the testimony of Dr. Robert A. Riley, Psy.D., a clinical neuropsychologist based in Augusta, who examined the Defendant on issues of competency on March 30, 2017. Dr. Riley again examined the Defendant on May 25, 2017 as part of a further neuropsychological evaluation. By agreement of the parties, the Court accepted Dr. Riley's written reports dated April 20, 2017 and June 14, 2017 as evidence at the competency hearing. The Defendant was present and chose not to testify and did not call any witnesses.

The Defendant is a 25-year-old man who was born in Cambodia. He has some limited proficiency in his first language of Khmer but it has never been his main language. Most of his education and upbringing was in an environment where English was the primary language. He had psychological evaluations in 2010 and 2011 to assess him for schooling purposes.

1

In 2010, the Defendant was found by his examiners to have a "Full Scale IQ in the borderline range. However, there was wide variability in his abilities, including average perceptual reasoning skills, but impaired (1st percentile) verbal comprehension skills. He also had a very low working memory index. He was said to show evidence of having both auditory processing disorder and a processing speed disorder." The evaluation noted significantly reduced verbal skills and that complex directions would need to be broken down into small steps.

In 2011, another evaluation was done that found the Defendant struggled with attention and memory issues. This evaluation found his "Full Scale IQ in the borderline to extremely low range (2nd percentile). He again demonstrated limitations in working memory, although his processing speed was low average. The psychologist concluded that the Defendant was diagnosed with several disorders including a cognitive disorder, communication disorder, adjustment disorder, ADHD traits and intermittent explosive disorder among other things.

The Defendant graduated from high school in 2011 with the help of special education services. The Defendant obviously took and passed a driving course and passed a driving test and obtained a Maine driver's license. He didn't attend any further schooling but was able to obtain a job working in a warehouse. The Defendant was able to maintain that job for 3 years – only losing that job when this charge became known. Defendant's mother helps him manage his money as he doesn't spend his money. The Defendant has never been on psychiatric medications nor abused drugs or alcohol. He reports no major medical issues like brain injuries, seizures or heart attacks.

When the Defendant spoke to Dr. Riley as part of the examination process he was initially reluctant to answer questions and looked to his attorney for guidance. When his attorney explained it was alright for him to answer the questions, the Defendant opened up more to Dr.

2

Riley. The Defendant initially denied knowing what the charge against him was but later demonstrated that he knew that it didn't involve a bank robbery or a stolen car but instead involved a "something sexual assault" involving a family member and that it was "real serious". He understood that a felony was more serious than a misdemeanor charge and he thought his charge was a felony. When asked about what the possible sentence could be for his charge, the Defendant stated "lifetime, I don't know."[1]

When police showed up to question the Defendant about the crime involving his young niece (presumably without notice) the Defendant was able to tell police that he had done something really bad to her and that it happened a long time ago. The Defendant allegedly told police that he had had intercourse with his niece and that it had just occurred one time only. The Defendant explained that when his niece said it hurt, he stopped. The Defendant explained that he knew what he had done was illegal and he asked police what was going to happen to him. He was apparently told by police that the case was going to be sent to the D.A.'s office and they would decide if he would be charged with Gross Sexual Assault.

The Defendant has no experience with the court system but was able to correctly describe the role of a judge in that a judge sometimes decides guilt or innocence and then sentences a guilty person. The Defendant demonstrated no real understanding of the difference between a prosecutor and a defense attorney. He was able to correctly explain the concept of bail and probation and what might happen if one violates probation. The Defendant initially seemed to have trouble understanding issues related to the plea bargain process.

After the initial competency evaluation, Dr. Riley concluded that no medications or treatment could make the Defendant's skills or limitations improve as they were a result of

---

[1] It is interesting to note that Defendant is correct that if convicted of a Gross Sexual Assault charge involving a child victim under 12 years old, the possible sentence is "for any term of years" or in other words a possible life sentence. 17-A M.R.S.A. 1252(4-E).

"long-standing developmental disabilities". In the end, Dr. Riley concluded that the Defendant should be able to "understand basic information pertaining to his case, and likely would, with extensive explanations, repetition, and other such compensatory strategies, be able to understand basic information pertaining to possible options in his case. It may be more difficult for him to understand complex alternatives, or complex information which might be presented if there were an actual trial. His ability to understand, quickly process, and express information all appear limited to some degree, and it could be increasingly difficult for him to follow along with trial proceedings."

The Defendant was administered some tests during the neuropsychological evaluation. The Defendant was cooperative with Dr. Riley and was noted as appearing to understand the directions without need for repetition or clarification. The Defendant gave adequate effort and asked several times if he was doing okay. "On some tasks, particularly for auditory memory or attention, he appeared to give up somewhat easily, but with further prompting or encouragement, he would come up with more information and be able to recall more than was initially apparent. For visual tasks, he appeared to be quite meticulous, and actually would erase and try to fix minor errors, even when he was performing quite well."

After the second evaluation and subsequent testing of the Defendant, Dr. Riley felt more confident that the Defendant was able to understand more than he appears. Dr. Riley opined that the Defendant presents a "mixed picture" in that he can understand complex information if it is broken down for him in small chunks but he may have problems verbalizing his responses to his attorney. The Defendant "performed quite well (in the average range or better) for many tasks, including tasks of visual constructional and visual perception skills, abstract visual reasoning, processing speed and divided attention skills, basic psychomotor speed, and visual memory. At

4

the same time, he demonstrated weaknesses and limitations in many areas, particularly for many aspects of expressive verbal skills including vocabulary and general knowledge. His receptive vocabulary skills appear better with performance in the low average range, suggesting that he is able to recognize and understand a higher degree of information than he is able to spontaneously express on his own." After further testing, Dr. Riley explained that he was more confident that the Defendant was competent to stand trial if the court were patient and allowed the Defendant to take breaks to speak with his attorney and to repeat and process the information at trial. Dr. Riley indicated that, if new information were brought up at trial, it might be difficult for the Defendant to process. Existing information from discovery shouldn't be as hard for him to understand, process and recall at trial. In conclusion, Dr. Riley opined that the Defendant should be competent and be able to assist his attorney through the court process as long as the courts were patient with the Defendant and allowed him the proper time to discuss matters with his attorney.

A competent defendant is one who is capable of understanding the nature and object of the charges against him, comprehending his own condition in reference thereto, and cooperating with counsel to conduct a defense in a rational and reasonable manner. *Haraden v. State,* 2011 ME 113, ¶ 7. Counsel cannot effectively assist his client when the client is unable to meaningfully communicate with counsel. *Id.* at ¶ 11. Both the Defendant and the State agree that the central issue in this case is whether the Defendant, given his disabilities, will be able to cooperate with his counsel in conducting a defense in a reasonable and rational manner. Based on all of the evidence and the opinions of Dr. Riley coupled with the court's patience and understanding, this court finds, by a preponderance of the evidence, that the Defendant is

5

competent to stand trial and has demonstrated an ability to perform each function set forth in *Haraden.*

Dated: August 30, 2017

Eric J. Walker,
Judge, Maine District Court