STATE OF MAINE                    UNIFIED CRIMNAL COURT
KENNEBEC, SS.                     AUGUSTA
                                 DOCKET NO-CR-19-2350


STATE OF MAINE

                                 **DECISION AND ORDER ON MOTION
                                 TO SUPPRESS**

V.

NICHOLAS LOVEJOY
        Defendant

## INTRODUCTION

The Defendant, Nicholas Lovejoy (Lovejoy), stands indicted for intentional or knowing murder in connection with the death of Melissa Sousa, alleged to have occurred in Waterville on October 22, 2019. Jury selection is scheduled for May 5-6, 2021, with the trial to commence on May 9, 2022, and continuing until completed. Lovejoy has filed a motion to suppress seeking to exclude the following evidence at the trial:

(1) All observations and/or evidence resulting from the initial detention (i.e., motor vehicle stop) of Defendant occurring on or about October 23, 2019 at 00:40 [12:40 p.m.] by Waterville Police Officers;

(2) All observations and/or evidence (including so-called "fruit of the poisonous tree" evidence derivatively obtained) resulting from the warrantless entry into, and subsequent search of, 32 Gold Street, Waterville, Maine on or about October 23, 2019, which search occurred shortly after Defendant was taken into custody following the above-described motor vehicle stop, and;

(3) Any statements made by Defendant while in custody at the Kennebec County Jail on October 23, 2019 (the "KSO Interview") which were either not voluntary and/or in violation of his *Miranda* rights.

A testimonial hearing on the motion to suppress was held on January 21, 2022, at which time the court received the testimony of the following witnesses: Officer Codey Fabian and Sgt. Jason Longley, of the Waterville Police Department, and Detective Joshua Birmingham of the Maine State Police. State's Exhibits 1, 2 and 3, being respectively, (1) a diagram of the first floor of the residence at 32 Gold Street, (2) a DVD containing a portion of the interview with Lovejoy by Detectives Birmingham and Brockway at the Kennebec County Jail at approximately 4:40 p.m. on October 23, 2019, and (3) a transcript of that portion of the interview contained in State's Exhibit 2. The court has subsequently received, by agreement, State's Exhibits 2A and 3A, being a DVD and transcript, respectively, of the entire interview with Mr. Lovejoy at the jail.

Defense Exhibits 1A, 1B, 1C, 2, 5 and 6 were admitted into evidence. Defense Exhibits 1A, 1B, 1C and 6 are contained on a flash drive and are videos of, (1A) Mr. Lovejoy walking his dog around the property at approximately 11:37 p.m. on October 22, 2019, (1B) Lovejoy's motor vehicle being stopped by police at the intersection of Summer and Gold Streets at approximately 12:40 a.m. on October 23, 2019, and (1C and 6) law enforcement officers entering Lovejoy's apartment at 32 Gold Street at approximately 1:00 p.m. on October 23, 2019. Defense Exhibit 2 is a copy of the Maine Motor Vehicle Inspection Manual (Revised 08-29-13). Defense Exhibit 5 is a screen shot from one of the videos. Defense Exhibits 3 and 4 are narrative reports prepared by Officer Fabian that were referred to and used

2

at the hearing, but not admitted into evidence. The parties have submitted thorough memoranda in support of their respective positions. Oral argument was held on April 1, 2022.

Based upon the evidence presented at the hearing, the court makes the following findings of fact.

## FACTS

Nicholas Lovejoy and Melissa Sousa had a long-term relationship.[1] They were the parents of twin daughters, who were 8 years of age on October 22-23, 2019. Lovejoy, Sousa and the two children lived in an apartment at 32 Gold Street in Waterville.

Sometime around 6:45 p.m. on October 22, 2019, Megan Legasse, a friend of Melissa's, reported to the Waterville Police Department that she had not heard from Melissa all day, which was unusual for her. She also commented that Melissa's boyfriend had been abusive in the past. As a result of this information, Officers Codey Fabian and Nate Bernier were dispatched to 32 Gold Street to conduct a welfare check for Melissa. Prior to heading to 32 Gold Street, Officer Fabian received information from his fellow officer (Officer Allen) that Lovejoy had a history of possessing firearms.

Officers Fabian and Bernier arrived at 32 Gold Street at about 7:13 p.m. The officers knocked on the door, but it appeared that no one was home. Officer Fabian tried calling Mr. Lovejoy, Ms. Sousa and Ms. Legasse, all without success. The officers left and returned to the police station.

At approximately 8:00 p.m., two women, Terry Cushman and Shannon Lewis, came to the Waterville Police Department and spoke to Officer Fabian about Melissa Sousa, and the concerns they had for her safety. With that

---

[1] It is the court's understanding that Mr. Lovejoy and Ms. Sousa were not married, but Lovejoy would refer to Melissa as his wife.

additional information, Fabian, along with Sgt. Jason Longley, returned to 32 Gold Street at 10:30 p.m. in an effort to contact or locate Lovejoy and/or Sousa. The officers saw that lights were on inside the apartment and a Jeep Compass was now parked in the driveway. The vehicle was registered to Melissa Sousa.

Lovejoy opened the door in response to the officer's knock. After telling him that they were there to check on Melissa "because some folks had expressed concern for her safety," Lovejoy told them that Melissa

> ... had left around 7:30 that morning to bring the children to the school bus stop, came back to the residence, then left the residence again to get them both a coffee at the store, and then immediately jumped to, she left the residence on foot at nine a.m., and he did not know where she had gone and she had not returned. (Hearing Transcript at 125)

The conversation with Mr. Lovejoy lasted about 45 minutes, with the officers ending it at 11:12 a.m. The officers asked Lovejoy if they could step inside the apartment to talk, but he declined as "he didn't want us going inside the residence because his two eight-year-old daughters were asleep inside." (H.T. at 126). As the conversation between the officers and Lovejoy was concluding, "he asked if it was okay if he left his two eight-year-old daughters asleep in the residence while he went back out looking for Melissa. We informed him that that's not okay, that they are definitely not old enough to leave alone in the residence." *Id.*

After the officers left 32 Gold Street, Sgt. Longley instructed Officer Fabian to place the residence and Lovejoy under surveillance. Fabian positioned his police cruiser 100-150 yards up Summer Street, where he had a view of the side of 32 Gold Street, where the Jeep was parked. He was equipped with a pair of binoculars. From this vantage point, he was able to

4

see Lovejoy inside what appeared to be the kitchen area of the apartment using a cleaning mop. At about 11:37 p.m., Officer Fabian watched Lovejoy outside walking his dog around the property for about 12 minutes.

At about 12:30 a.m. on October 23, 2019, Fabian saw Lovejoy come out of the apartment, get into the Jeep and pull out onto Summer Street, taking a left turn towards the intersection of Gold Street. Officer Fabian saw that the left plate light on the Jeep was out. The right plate light was functioning properly. Fabian was directed to stop the Jeep, and he did so immediately at 12:31 a.m.[2], effectuating the stop 10-20 yards from Lovejoy's apartment. Other police officers with cruisers arrived quickly thereafter, including Sgt. Longley.

Lovejoy was the sole occupant of the vehicle. While Officer Fabian spoke to Lovejoy at the driver's side window, Sgt. Longley saw a shotgun with a magazine inserted in the front passenger seat. Lovejoy confirmed that the gun was loaded. Lovejoy told the police that he was on his way to the store and had the gun for self-defense. Longley instructed Fabian to arrest Lovejoy for having a loaded firearm while in a vehicle (12 M.R.S. § 11212(2)) and endangering the welfare of a child (17-A M.R.S. § 554(1)(C)).

While Lovejoy was being taken into custody, he was informed that the police would be entering his apartment to check on the safety of the children. Lovejoy did not give, nor was he asked for, consent for the police to enter his residence. Nevertheless, there must have been some conversation in which Lovejoy told the police about the whereabouts of a spare key under a rock,

---

[2] Officer Fabian testified that the stop was made at about 12:40 a.m. on October 23, 2019. The times referred to in the text are taken from the cruiser video of the stop, which is what the court will use for purposes of this Decision and Order.

because the police used that key to open the door to the apartment at 12:59 a.m. on October 23, 2019.

Officer Fabian entered the residence along with Officer Dinsmore and Sgt. Longley. Fabian looked in the kitchen area and an enclosed porch but did not locate the children. He did see a piece of cardboard in the porch area that had red/brown stains on it, which appeared to Officer Fabian to be blood. In looking down the hallway on the first floor, Fabian could see a bottle of ammonia on the toilet, and he smelled the odor of cleaning solution. (H.T. at 24-25). Fabian left the apartment within a couple of minutes to transport Lovejoy to the police department.

Sgt. Longley also saw the red/brown stains on the cardboard in the porch and observed a red/brown stain on the toe of a boot, and on a roll of duct tape. A mop was in the kitchen sink, there was the smell of ammonia and the floors appeared to have been recently mopped. The officers were on the first floor for about 2 minutes without locating the children.

As the officers approached the stairway to the second floor, they encountered a dog, which was tethered and aggressively barking at them. A short time later, Sgt. Tremblay with the Maine State Police arrived and suggested calling out to the children, which was done with no response. In the meantime, Sgt. Longley directed Officer Rolfe to bring a "catch-pole" to secure the dog. Rolf arrived with the device 10-15 minutes later. Once the dog was dealt with, Tremblay and Longley walked to the second floor and found the two girls sleeping in their bedroom. The search for the girls, including the wait for Officer Rolfe to bring the "catch-pole," took about 30 minutes or less. During this period, the Department of Health and Human Services was notified of the situation and, at some point, took responsibility for the children.

6

Early in the morning of October 23, 2019 (about 6:00 a.m.) Sgt. Joshua Birmingham and Detective Ryan Brockway spoke to Mr. Lovejoy at the Waterville Police Department. That interview is not being challenged in this proceeding. Later that day (about 4:40 p.m.), however, Birmingham and Brockway sought to interview Lovejoy again, this time at the Kennebec County Jail. The interview room was equipped with an operating video camera.

Shortly after the detectives entered the interview room, Det. Brockway said: "I'm just going to start a recording device here." (State's Exhibit 3 at 2). As the detectives were preparing to read the *Miranda* rights to him, Lovejoy said: "So what do you guys want?" Birmingham reminded Lovejoy that they had spoken earlier and that the detectives would probably come back to speak with him again. Lovejoy replied: "Yeah, that's fine."

Det. Birmingham then read each *Miranda* warning from a card. When asked if he understood each right, Lovejoy said: "yes." When asked if he wanted to answer questions "at this time," Lovejoy said; "Not on camera." (State's Exhibit 3 at 3). Birmingham made it clear that the interview had to be audio-recorded, but there was no mention of the fact that a video camera was recording the interview and continued to do so. During the brief discussion of the camera issue, Lovejoy asked: "What are you guys lookin' for a deal?" When asked what he meant by that, Lovejoy wanted to know what the officers "needed." Birmingham explained that he wanted to talk "a little bit more about what we talked about this morning."

Lovejoy said that he did not remember the morning, but later said he remembered talking to the detectives at the police station. When Lovejoy complained that he could not get any answers to his questions about where his kids and "wife" were, Birmingham interjected: "well, we found your wife,

7

Nick." Lovejoy asked: "Where?" Birmingham countered with: "Where do you think?", to which Lovejoy responded: "No idea." (State's Exhibit 3 at 5).

Det. Brockway then got back to the point of whether Lovejoy was "okay with chatting with us so that we can share this stuff with you, okay?" The following colloquy then took place:

LOVEJOY: Well what do you want?

BROCKWAY: It's a back and forth.

LOVEJOY: It is, but I'm still in cuffs. What are you looking for?

BROCKWAY: So –

LOVEJOY: So, you found what? The body?

BROCKWAY: Are you okay – we got to take one step at a time.

LOVEJOY: No, I'm not okay.

BROCKWAY: Okay, well.

LOVEJOY: I'm losing my kids, I'm losing my wife. I'm losing everything I fuckin' built.

BROCKWAY: Nick, we can't skip steps. So, the first thing –

LOVEJOY: I'm not tryin' to skip steps.

BROCKWAY: . . . the first thing that we have in front of us is the Miranda Warning.

LOVEJOY: Yeah.

BROCKWAY: Okay.

LOVEJOY: Okay, it's done.

BROCKWAY: So he read it.

LOVEJOY: Yeah.

BROCKWAY: Are you waiving those rights?

LOVEJOY: Waiving those rights?

BROCKWAY: Yes. Are you saying that you're good with the rights, you're waiving the rights so that we can talk with you and ask you questions and share information with you?

LOVEJOY: Well, what are you trying to ask me? Ask me what you're trying to ask.

BROCKWAY: We can't do that until you tell us that you're waiving your rights.

LOVEJOY: I don't waive anything.

BROCKWAY: It's just, it's just what I just read to you – now having all the rights in mind –

LOVEJOY: I know what it is.

BROCKWAY: . . . I explained to you.

LOVEJOY: I know what it is.

BROCKWAY: Okay.

BIRMINGHAM: Right. Do you wish to answer questions at this time?

LOVEJOY: Ahh, I guess I {inaudible] depending on what questions you have.

BROCKWAY: Right.

LOVEJOY: Otherwise, I will ask for my lawyer.

BROCKWAY: Okay, so you're okay with talking with us but you're going to choose on what you answer and what you don't answer am I understanding that correctly?

LOVEJOY: Think my lawyer could answer that better. I don't know what you're lookin' for.

BROCKWAY: Exactly what that says.

BIRMINGHAM: Right.

LOVEJOY: I'm not waiving my rights.

9

BIRMINGHAM: No, so, so –

LOVEJOY: I have all the right.

BIRMINGHAM: Right. So Nick, I think this is a matter of semantics at this point. So, this is called a waiver, this is – when I say, which I've already asked you and you agreed to. Now having all the rights in mind which I just explained to you do you wish to answer questions at this time?

LOVEJOY: And I said depending on what questions you have.

BIRMINGHAM: Right. So –

LOVEJOY: What questions do you have?

BIRMINGHAM: So now that you, you know, we've kind of touched on the lawyer thing are we good to ask you questions at this point and if you don't like them you're –

LOVEJOY: If it's about Melissa I want my lawyer here.

BIRMINGHAM: If it was about Melissa?

LOVEJOY: If it was about Melissa I want my lawyer here.

BIRMINGHAM: Okay. So, you think it's fair for us to continue with this and if we ask you a question that you don't want to answer you can tell us because I don't want to touch on something that you don't want to answer. Does that make sense?

LOVEJOY: Okay.

LOVEJOY: Is she alive?

BIRMINGHAM: [No verbal response heard]

LOVEJOY: Okay [exhales] what are you asking?

BIRMINGHAM: Well I think first and foremost we'd like to have your side of the story.

LOVEJOY: I've given you the story. The story from what I've told you has not changed.

10

State's Exhibit 3 at 5-8.

The conversation continued about what had happened to Melissa and what role Lovejoy played in her death, with Lovejoy making numerous inculpatory statements to the detectives.

## DISCUSSION

### I.    The Stop on Summer Street

Lovejoy contends that the stop of his motor vehicle at approximately 12:31 a.m. on October 23, 2019 was not justified by reasonable, articulable suspicion.  Lovejoy disputes that the inoperable plate light on the vehicle provided a legitimate basis for the stop.  Title 29-A M.R.S. §1909 provides:

> A vehicle must have a white light capable of illuminating the rear registration plate so that the characters on the plate are visible for a distance of at least 50 feet.

The Maine Motor Vehicle Inspection Manual, § 170(9)(A)(1) states that a vehicle must be rejected for inspection "if any bulb in any lamp required by law or regulation fails to function." (Defense Exhibit 2).  Further, the Manual requires rejection of a vehicle for inspection if the "rear plate lights do not operate properly in all switch positions."  § 170(9)(D)(9).

Lovejoy argues that because the right rear plate light was functioning, Officer Fabian failed to articulate that the characters on the plate were not visible for 50 feet and, therefore, his suspicion that a violation of the law had occurred was unreasonable.  The court disagrees.

The Law Court has held that "[a] stop is justified when an officer's assessment of the existence of specific and articulable facts indicating a possible violation of law or a public safety risk is objectively reasonable considering the totality of the circumstances." *State v. Simmons,* 2016 ME ME 91, ¶ 9 (quoting *State v. Connor,* 2009 ME 91, ¶ 10, 977 A.2d 1003).

11

"[T]he threshold for demonstrating an objectively reasonable suspicion necessary to justify a vehicle stop is low . . . . The suspicion need only be more than a speculation or an unsubstantiated hunch." *State v. LaForge,* 2012 ME 65, ¶ 10, 43 A.3d 961. "Safety reasons alone can be sufficient if they are based upon 'specific and articulable facts.'" *State v. Pinkham,* 565 A.2d 318, 319 (Me. 1989). *See State v. Fuller,* 556 A.2d 224 (Me. 1989) (blinking headlights which officer believed were possibly defective justified stop).

The standard is reasonable, articulable suspicion, not actual proof that one bulb fails to illuminate the entire license plate and the characters thereon. When Officer Fabian saw that one of the two lights on the Jeep was inoperable, he had a reasonable, articulable suspicion that a violation of 29-A M.R.S. § 1909 and the safety inspection standards was occurring.

Moreover, the court finds that Officer Fabian had reasonable articulable suspicion that Lovejoy was possibly endangering the welfare of his 8-year-old children, by leaving them alone in the apartment late at night, under circumstances that raised legitimate concerns about their wellbeing. The totality of the circumstances here presented law enforcement with numerous red flags about the safety of the children. The mother of the children was missing and several of her friends were so concerned about her safety that they contacted the police to raise the alarm, including providing information that Melissa was in an abusive relationship with Lovejoy. The story told by Lovejoy about the last time he had seen Melissa was highly suspicious and troubling, suggesting that Melissa had voluntarily walked away from her home and children, for no apparent reason, and never returned. Lovejoy was seen mopping the apartment late at night, a suspicious activity in the total context of the case, and he had been cautioned by the police just an hour and a half earlier not to leave the children alone in the apartment. Nevertheless,

12

Lovejoy was stopped as he pulled out of the driveway, leaving the children inside.

Under the totality of the circumstances, the court concludes that the stop of Lovejoy at 12:31 a.m. on October 23, 2019, was valid and lawful.

## II.    The Warrantless Entry into the Apartment

Lovejoy maintains that the warrantless entry into his apartment at 12:59 a.m. on October 23, 2019, violated his Fourth Amendment rights.

Searches and seizures inside a home are "presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* One such exception is where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the circumstances." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively, justify the action.*'" *Brigham City*, 547 U.S. at 404. *Accord Michigan v. Fisher*, 558 U.S. 45 (2009).

Under the "exigent circumstances" doctrine,

> . . . the police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm. To rely upon the doctrine, the government must show a reasonable basis, approximating probable cause, both for the officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude. The requisite inquiry must be undertaken in light of the totality of the circumstances confronting the officers, including in many cases, a need for an on-the-spot judgment based on

13

incomplete information and sometimes ambiguous facts bearing
upon the potential for serious consequences.

*United States v. Martins*, 413 F. 3d 139, 147 (1st Cir. 2005).

The court is aware of and has reviewed the Supreme Court's recent decisions in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021) and *Sanders v. United States*, 141 S. Ct. 1646 (2021), and understands those cases to stand for the proposition that the so-called "community caretaking" function of law enforcement does not "create[ ] a standalone doctrine that justifies warrantless searches and seizures in the home." 141 S. Ct. at 1598. Moreover, as the concurrences make clear, nothing in *Caniglia* or *Sanders* has undermined the continuing validity of the "exigent circumstances" exception to the warrant requirement. As observed by the court in *United States v. Bradley*, 321 F.3d 1212, 1214-15 (9th Cir. 2003), "[t]he appropriateness of the emergency doctrine is best understood in light of the particular facts of a case in which it is invoked."

In view of the totality of the circumstances in this case, the court concludes that it was objectively reasonable for the police to make a warrantless entry into Mr. Lovejoy's apartment at 12:59 a.m. to ensure that the two 8-year-old children of Lovejoy and Sousa were safe and unharmed. In the court's view, the highly disturbing circumstances surrounding the disappearance of Melissa Sousa, the mother of the children, and the information that she was involved in an abusive relationship with Lovejoy, created an objectively reasonable belief on the part of law enforcement that clearly justified their concern for the welfare of the children on the night of their mother's disappearance. Lovejoy's explanation to the police that Melissa walked away on foot and never returned or made any contact with Lovejoy or the children, justifiably caused the police to be on high alert not

14

only for Melissa's safety, but for that of the children as well. The sight of Lovejoy mopping at midnight only generated more cause for concern. When Lovejoy left the apartment and drove off in the Jeep, leaving the children alone in the residence, the police immediately stopped him, as they had advised him earlier not to leave the children unattended. Upon finding a loaded shotgun in the front passenger seat of the vehicle, and making the decision to place Lovejoy under arrest, it was objectively reasonable for the police to take prompt action to locate the children, ensure that they were well, and arrange for their safekeeping.

In a case involving a comparable, but not identical factual situation, the court in *Bradley stated:*

> The possibility of a nine-year-old child in a house in the middle of the night without supervision of any responsible adult is a situation requiring immediate police assistance.

*United States v. Bradley*, 321 F.3d at 1215 (citing cases).

Other courts have reached the same conclusion. *See, e.g., United States v. Martins*, 413 F.3d at 148 (citing and relying on *Bradley*); *Commonwealth v. Hale*, 2009 Mass. App. Unpub. LEXIS 1308 *4 (citing and relying on *Bradley* and 3 LaFave, *Search & Seizure* § 6.6(a) for the proposition that an entry is reasonable to assist small children). *See also Caniglia v. Strom*, 141 S. Ct. at 1605 (Kavanaugh, J., concurring) ("cases involving unattended young children inside a home, illustrate the kinds of warrantless entries that are perfectly constitutional under the exigent circumstances doctrine").

As stated by the court in *Jones v. State*, 54 N.E.3d 1033, 1038 (Ind. App. 2016):

> We cannot find many situations more urgent than three children left alone in their home in the middle of the night without any

15

certainty as to when a responsible adult might next enter the home.

The court rejects the argument that the police waited too long before making the warrantless entry into 32 Gold Street. The Jeep was stopped at about 12:31 a.m. The police used the spare key to enter the apartment at about 12:59 a.m. The court does not find that the less than 30 minutes it took the police to deal with Lovejoy and his arrest, and to organize and confer about what to do next, undercuts the objectively reasonable belief that exigent circumstances existed that necessitated a warrantless entry to look for the children.

Similarly, the court does not find persuasive the argument that the police could have secured the residence with the children inside and applied for a search warrant to enter and look for them. The emergency was the fact that the two young children were alone in a house in the middle of the night under circumstances where one parent had been taken into custody and the other had gone missing and was unaccounted for, and where the police had information from close associates of Melissa that the household had experienced some form of domestic violence. It was objectively reasonable for the police to act promptly to determine that the children were safe, without potentially waiting for hours for a warrant to be obtained. This was not a search for evidence – it was a search for the children.

Finally, the scope of the "protective sweep" by the police once they made the warrantless entry was limited, reasonable and focused on looking for the children. The police did not go down to the basement or open drawers and cabinets. Rather, they made a quick sweep of the first-floor area and went upstairs to locate the children, once the barking dog was secured and neutralized.

The court concludes that the warrantless entry into the apartment at 32 Gold Street at 12:59 a.m. on October 23, 2019, was objectively reasonable under the "exigent circumstances" exception to the warrant requirement.

### III.    The Interview at the Kennebec County Jail

Lovejoy seeks to exclude from evidence at trial any statements he made to Sgt. Birmingham and Det. Brockway during their interview of him at the Kennebec County Jail on October 23, 2019. Lovejoy argues that the detective obtained statements from him in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and that his statements should also be suppressed as involuntary.

For the reasons discussed below, the court concludes that Lovejoy made an unambiguous request for a lawyer and having done so, questioning of him by the detectives should have immediately ceased until a lawyer was present. The court further finds beyond a reasonable doubt, however, that Lovejoy's statements were voluntary.

"No . . . person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that "to safeguard the privilege against self-incrimination, the Due Process Clause requires that incriminating statements obtained during a custodial interrogation be inadmissible as evidence against a defendant unless the defendant was provided a full and effective warning of his rights." *United States v. Cheng*, 2022 U.S. Dist. LEXIS 6437 *6 (S.D. Texas). Included in those rights is the right to counsel.

"Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). A person may waive his or her *Miranda* rights "provided the waiver is made

17

voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458. *See also Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (once suspect has invoked his right to counsel, "the interrogation must cease until a lawyer is present").

It can happen, of course, that a suspect may make an ambiguous or equivocal statement about counsel. In that event, "officers may seek to ask clarifying questions to ensure that the suspect has actually invoked his or her right to an attorney." *Davis*, 512 U.S. at 461. Clarifying questions, however, may not be used "as a guise for convincing a suspect to waive his or her rights." *Cheng*, 2022 U.S. Dist. LEXIS 6437 *7. *See Edwards*, 451 U.S. at 485.

In reviewing the colloquy between the detectives and Lovejoy at the jail, the court can appreciate the efforts of the officers to focus on the issue of whether Lovejoy was "waiving" his *Miranda* rights and agreeing to answer questions without a lawyer being present. At various points, Lovejoy seemed to invite the officers to ask him questions, but at other times he expressly told the detectives that he was not "waiving anything." When asked directly whether he wished to answer questions "at this time," he initially replied, "depending on what questions you have," clearly implying at least that he was willing to answer some questions. He immediately followed that up, however, by stating: "Otherwise, I will ask for my lawyer." This was repeated more than once, with the detectives trying to get clarification from Lovejoy regarding what he wanted to do.

Finally, Lovejoy asked: "What questions do you have?" Birmingham quite properly sought to clarify what Lovejoy meant: " . . . are we good to ask

18

you questions at this point and if you don't like them –" Here, Lovejoy interjected:

LOVEJOY: If it's about Melissa I want my lawyer here.

BIRMINGHAM: If it was about Melissa?

LOVEJOY: If it was about Melissa I want my lawyer here.

BIRMINGHAM: Okay. So, you think it's fair for us to continue with this and if we ask you a question that you don't want to answer you can tell us because I don't want to touch on something that you don't want to answer. Does that make sense?

LOVEJOY: Okay.

LOVEJOY: Is she alive?

BIRMINGHAM: [No verbal response heard]

LOVEJOY: Okay [exhales] what are you asking?

BIRMINGHAM: [No verbal response heard]

LOVEJOY: Okay [exhales] what are you asking?

BIRMINGHAM: Well I think first and foremost we'd like to have your side of the story.

LOVEJOY: I've given you the story. The story from what I've told you has not changed.

(State's Exhibit 3 at 7-8)

When Lovejoy said he wanted his lawyer present if the questioning concerned Melissa, the court finds that he made a clear, unambiguous and unequivocal invocation of his right to counsel. Sgt. Birmingham confirmed with Lovejoy that he wanted a lawyer if Melissa was discussed, and Lovejoy repeated what he had just said. There was no need to clarify what Lovejoy was saying – while he might answer questions depending on what they were, he wanted a lawyer with him if the subject of the conversation was Melissa.

19

Under these specific set of circumstances, the court concludes that Lovejoy invoked his right to counsel and no questioning, interrogation or conversation about Melissa with the two detectives could occur until a lawyer was present.

The court acknowledges that Lovejoy asked the question "Is she alive?" without being asked a question by the police. Moreover, when the detectives did not verbally respond, it was Lovejoy who said "Okay, what are you asking?" From that point on, of course, the subject of the conversation was entirely about Melissa.

It can be argued that Lovejoy, having twice said he wanted a lawyer with him if the questions were about Melissa, quickly changed his mind and essentially waived his right to counsel when he asked if Melissa was alive and what the police were asking, and then proceeded to answer questions about Melissa. The danger with that argument, as the court sees it, is that Lovejoy made two emphatic invocations of his right to counsel if Melissa was going to be discussed. Everyone in that interview room knew, without doubt, that the only reason the detectives were there was to talk about Melissa with Lovejoy. There was no other reason for them to be there talking to Lovejoy. When Lovejoy invoked the right to counsel, clearly and unambiguously, the conversation should have ended. The detective, however, kept the conversation going, with the result that Lovejoy started talking about Melissa. To find that this was not a *Miranda* violation of the right to counsel would run the risk of encouraging law enforcement not to scrupulously honor the right to counsel when invoked, but to keep talking, in the form of clarifying questions, with the hope that the suspect will speak without a lawyer being present. *Michigan v. Mosely*, 423 U.S. 96, 103 (1975). As the Court said in *Edwards*, follow-up clarifying questions may not be used as a device to persuade a suspect to waive his rights. 451 U.S. at 485.

20

Although the court finds that Lovejoy's invocation of his right to counsel was not scrupulously honored and, therefore, the State has failed to show by a preponderance of the evidence that his statements were obtained in compliance with *Miranda v. Arizona*, the court also finds, beyond a reasonable doubt, that the statements were voluntary.

In *State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911, the Law Court clarified the "distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice." The latter situation employs a due process analysis and seeks to address the question of whether a defendant's "statements were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair." *Id.* The Court reaffirmed its holding in *State v. Mikulewicz*, 462 A.2d 497, 500-01 (Me. 1983) that "[a] confession is voluntary if it results from the free choice of a rational mind, if it not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." Some of the relevant factors that may be considered by the court in making the voluntariness assessment, include:

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903.

It is the State's burden to demonstrate that a statement is voluntary beyond a reasonable doubt. *State v. Annis*, 2018 ME 15, ¶ 13, 178 A.3d 467. *State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972).

Considering all the circumstances of the interview and applying the factors noted above, the court is satisfied beyond a reasonable doubt that the statements made to Sgt. Birmingham and Det. Brockway at the jail were voluntary on the part of Mr. Lovejoy. The tone of the conversation was professional and non-confrontational. The overall duration of the interview was short, but the court is aware that Lovejoy had been awake for a long time prior to the interview. The interview took place at the jail and was obviously custodial in nature. The police gave clear *Miranda* warnings and Lovejoy understood them. There were only 2 officers. The detectives were not demanding or aggressive. On the contrary, they were patient with Lovejoy and made the effort to understand his responses. There was no police trickery or any promises or threats of any kind. On the video, Lovejoy appeared alert in appearance and clear in his manner of speaking. He knew his rights. There is no evidence whatsoever of any coercion.

The court concludes that Lovejoy's statements were given freely and voluntarily, and their use at trial for a limited purpose would not be fundamentally unfair.

## CONCLUSION

The entry is:

Defendant's Motion to Suppress is GRANTED IN PART and DENIED IN PART.

The Motion to Suppress based on the stop of the Jeep is DENIED.

The Motion to Suppress based on the warrantless entry into the residence is DENIED.

22

The Motion to Suppress the interview of the Defendant at the Kennebec County Jail on October 23, 2019 is GRANTED, and the State will not be allowed to use that interview as evidence at trial in its case-in-chief. Any use, by the State, of the statements in that interview for impeachment purposes will be decided at the time of trial.

Dated: April 7, 2022

William R. Stokes
Justice, Superior Court

Entered on the docket  4 | 7 | 2022